[This opinion has been published in *Ohio Official Reports* at 89 Ohio St.3d 306.]

CINCINNATI BAR ASSOCIATION *v.* YOUNG.

[Cite as *Cincinnati Bar Assn. v. Young*, 2000-Ohio-160.]

*Attorneys at law—Misconduct—Two-year suspension with second year of suspension stayed with one-year probation—Engaging, in a professional capacity, in conduct involving discrimination prohibited by law because of race, color, religion, age, gender, sexual orientation, national origin, marital status, or disability—Finding of discrimination by the Ohio Civil Rights Commission, the Equal Employment Opportunity Commission, or a state or federal court is not a prerequisite to the Board of Commissioners on Grievances and Discipline finding that an attorney violated DR 1-102(B).*

A finding of discrimination by the Ohio Civil Rights Commission, the Equal Employment Opportunity Commission, or a state or federal court is not a prerequisite to the Board of Commissioners on Grievances and Discipline finding that an attorney violated DR 1-102(B).

(No. 99-2308—Submitted April 11, 2000—Decided July 12, 2000.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 98-24.

―――――――――――――

{¶ 1} On April 6, 1998, relator, Cincinnati Bar Association, filed a complaint charging respondent, David J. Young of Cincinnati, Ohio, Attorney Registration No. 0009850, with violating DR 1-102(B) (engaging, in a professional capacity, in conduct involving discrimination prohibited by law because of race, color, religion, age, gender, sexual orientation, national origin, marital status, or disability), 1-102(A)(6) (engaging in conduct that adversely reflects on the lawyer's

fitness to practice law), and 9-101(C) (stating or implying that the attorney was able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official). All of the charges against respondent arose out of his conduct toward some of his former employees.

{¶ 2} A hearing before a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("panel") was held on July 8, 1999. The panel heard testimony from respondent, respondent's wife, Rhoda Young, respondent's daughter-in-law, Michele Young, Melodie Goodnough, a current employee of respondent, and four former employees of respondent, Elizabeth A. Crowe, Jessica J. Henn, Emma L. Seta, and Monica C. Miller. The panel's findings of fact follow.

{¶ 3} Respondent was admitted to the practice of law in Ohio in 1956. In 1957, respondent joined his father's law firm. Respondent now practices with his own son, Gregory S. Young. Respondent and his son are the sole owners of the law practice and respondent handles all of the hiring of support personnel, *i.e.*, secretaries and legal assistants. At no time prior to relator's complaint had respondent hired a male employee for his law firm. The law firm does not have a written sexual harassment policy.

{¶ 4} Respondent admitted, and his former employees testified, that during the period of 1995 through 1997, respondent would frequently become very angry and use abusive language to his employees. This behavior typically occurred three to four times each week.

### Elizabeth Crowe

{¶ 5} On Monday, April 7, 1997, Elizabeth A. Crowe, a law student at the University of Cincinnati School of Law, telephoned respondent's office to inquire about a legal assistant position advertised in a local Cincinnati newspaper. During the telephone conversation, Crowe told respondent that she was a law student. Respondent told Crowe that if he hired her he would have "an edge on [her] because

[she] was a law student." He said, "the advantage is that when you apply to take the bar exam, you'll have to say you worked with me and I'll have to give a recommendation and because of that, I can be sure you'll behave the way I want you to." Respondent instructed Crowe to find out as much as she could about him and call him at 1:15 p.m. the next day.

{¶ 6} On Tuesday, April 8, 1997, Crowe called respondent as requested and arranged to meet with him at his office at 2:30 p.m. that day. While sitting in the reception area waiting to see respondent, Crowe heard a loud voice coming from a back office and someone was being called an "asshole." Crowe later determined that the voice was respondent's and during the interview, respondent acknowledged that he had been yelling.

{¶ 7} Respondent and Crowe subsequently discussed Crowe's schedule and ultimately agreed that if she were hired she would work approximately fifteen hours per week. Respondent said, "I wasn't looking for a girlfriend but you seem to fill that position better than any other." Crowe assumed he was joking. Thereafter, respondent instructed Crowe not to discuss their conversations or her personal business with anyone, advising her that this was good training for maintaining attorney confidence.

{¶ 8} On Wednesday, April 9, 1997, respondent contacted Crowe and asked her to come to his office to meet someone. When Crowe arrived at respondent's office, she was introduced to respondent's wife, Rhoda Young. Respondent and Crowe again discussed the hours Crowe would work if hired, the hourly wage she would receive, and the firm's profit-sharing plan. Respondent told Crowe that, if hired, she would work directly with him and no one else.

{¶ 9} Respondent told Crowe that this was not the "real" interview and instructed Crowe to return for another interview on Friday, April 11, 1997. Again, respondent admonished Crowe not to talk to anyone about anything personal, and reminded her that he would have an impact on her future and that if she were the

best employee he ever had, when he wrote her recommendation for future jobs, he would say so.

{¶ 10} On Friday, April 11, Crowe went to respondent's office for the "real" interview. Respondent's wife again sat in on the discussion. During the interview, respondent told Crowe that she would be his personal assistant and that her duties were nonnegotiable because she had everything to gain and he had everything to lose. Crowe told respondent that she wanted to work with him, believing that he could teach her everything there was to know about the law.

{¶ 11} During the interview respondent asked Crowe, "So tell me, are you a virgin?" Crowe was shocked and responded quietly, "No." Respondent then said, "Oh, you shouldn't have answered that question. You should've realized that was entirely inappropriate for me to ask you that in an interview. You could've said, 'Why do you want to know? Are you writing a book?' * * * So if I asked you if you were wearing a bra . . . or if you were wearing panties . . . you wouldn't have to answer." (Ellipsis added in part.) Crowe felt uncomfortable, ashamed, and degraded while respondent made these remarks, but she thought that perhaps respondent's remarks indicated some "nifty lawyering" and was "a crass way of teaching [her] to think on [her] feet." Thereafter, respondent offered and Crowe accepted a job. Crowe testified that she accepted the job with respondent because she needed the job (she was behind in her rent) and because she believed that respondent could assist her in her legal career.

{¶ 12} On Crowe's first day of work, Tuesday, April 15, 1997, respondent told her that he was sorry for the sexual comments he had made on Friday. He said that he had discussed the matter with his wife and determined that the comments were inappropriate.

{¶ 13} On Crowe's next scheduled workday, Thursday, April 17, 1997, she ran errands with respondent. At one point during the day, respondent told Crowe that what he really wanted was a mistress and that she would be good in that

perspective. Crowe responded that her boyfriend would not appreciate that. Respondent replied that Crowe should be "sleeping around and have a lot of people in [her] life and not just one." Respondent nicknamed Crowe "Perky" and began calling her by this name.

{¶ 14} Also on this day, Crowe witnessed respondent verbally attack Jennifer Crow, another employee of respondent's, for having been away from her desk while doing paperwork in another office. According to Crowe, respondent appeared to be out of control and yelled: "I don't like you. I've never liked you. I don't know why I hired you. You won't do anything I ask you to. Why didn't you tell Greg [respondent's son] where you were going to be? He should know where you're going to be at all times. You should go into his office and say 'Greg, I'm going to be here' or 'Greg, I'm going to be there,' but to not say anything is ridiculous. You're a terrible worker. You're such a bitch. I hate you."

{¶ 15} While running errands with respondent on Friday, April 18, 1997, respondent again told Crowe that she should be "sleeping around." Respondent later apologized for his comments and Crowe said she was glad because she thought that they were inappropriate and made her feel very uncomfortable.

{¶ 16} Later that same day while Crowe, respondent, and respondent's office manager, Melodie Goodnough, were in respondent's office, respondent told Goodnough that she should find out what type of drink Crowe liked because he wanted to go away with Crowe one day during the next week to sleep with her and it would be easier for him to take advantage of her if he knew what she liked to drink. Crowe said, "That will never happen." Respondent laughed and said, "That will never happen, huh?"

{¶ 17} On Saturday, April 19, 1997, Crowe and Jennifer Crow were the first to arrive at the office in the morning. The telephone rang and Jennifer answered it. As she listened to the caller, respondent arrived at the office. According to Crowe, respondent ordered Jennifer to "get off" the telephone. Jennifer was attempting to

advise the caller that she needed to end the conversation; however, before she could do so, respondent took the telephone away from her. In the process, respondent "hit" her about the head. The nature and extent of the blow are subject to considerable disagreement. Respondent spoke to the caller and then hung up. Thereafter, he began to berate Jennifer, telling her that she was worthless, that he hated her, and that she was a nuisance. At that point, she told respondent not to hit her again. Respondent pounded his fist on the counter and told her that it was all her fault because she had been within his reach. He told her to make sure that from then on she was not within his reach. Respondent proceeded to tell Jennifer what a bad worker she was for never doing anything that he told her to do.

{¶ 18} Respondent then left the office for a short time and when he returned he started yelling at Jennifer again. Jennifer was crying. Respondent then began yelling at Crowe and appeared to be out of control. Fearing for her own personal safety, Crowe told respondent that she quit and left the office. Respondent followed her out of the office and down in the elevator. Crowe left the building. Upon realizing that she had forgotten her purse, Crowe went back to the office to retrieve it, whereupon respondent again followed her out of the office and into the street, and told her that she had to use him on her bar application and that she could "expect the worst."

{¶ 19} Jennifer initiated court proceedings against respondent. The matter was resolved through mediation, and respondent paid Jennifer $7,500 as part of a confidential settlement.[1]

### Jessica Joy Henn

{¶ 20} Jessica Joy Henn was hired by respondent and worked for him during the summer of 1995. During her interview, respondent said, "You're a cute girl. Do you have a boyfriend?" At one time during her employment with

---

1. Respondent's testimony revealed this term of the settlement.

respondent, respondent discussed with her the character and fitness requirements to take the Ohio Bar Examination and told her that he would be a reference for her and that he could give her a "glowing recommendation" and "wonderful comments."

{¶ 21} Henn witnessed respondent lose his temper and yell at employees almost daily during the course of her employment. She noticed that many times the recipient of respondent's anger would leave respondent's office crying. Several times Henn was the recipient of his anger and she also cried in response to his outbursts. On one occasion after respondent made her cry, he said, "I really feel like we've bonded here. This is a very positive time. This isn't negative. When we go out there, we need to tell them that we've just bonded." He then took her hand, shook it, gave her a hug, escorted her out of his office into the common area and said to the other office personnel: "Okay. Jessica needs to tell you all something. Make sure you tell them that we bonded." In response to his instructions, Henn said, "Well, he says that we've bonded." Respondent then again shook her hand and hugged her and said, "We've just bonded and that's the way it is."

{¶ 22} Respondent would often hug Henn after he yelled at her. Henn did not indicate to respondent that she wanted him to hug her and on at least one occasion Henn told respondent, "I feel this is very uncomfortable. I don't think you should be hugging me. We've just had a type of argument and, you know, your temper is kind of out of control. I'm intimidated and here you are giving me a hug, and this is very uncomfortable for me."

Emma Leigh Seta

{¶ 23} Emma Leigh Seta worked for respondent as a legal assistant from May 1997 to August 1997 while attending college. Her job duties with respondent were not very specific. She occasionally did some filing and accompanied

respondent on errands. About one month into her employment, respondent asked Seta if she had a boyfriend.

{¶ 24} During the three months that Seta worked for respondent, she performed very few law-related tasks and eventually told respondent that she would not sit in his office and do absolutely nothing as his legal assistant. On Seta's last day of employment with respondent, he told her to sit in a chair in his office virtually all day because he did not want her near the new computer equipment that was being installed. Respondent told Seta that when she applied to take the Ohio Bar Examination, he would give her a bad character reference. Respondent had previously told Seta that he knew influential people in Cincinnati, and Seta was afraid that respondent could adversely affect her ability to be licensed to practice law in Ohio by preventing her from passing the character and fitness examination. She discussed this fear with one of her law school professors.

Monica Carol Miller

{¶ 25} Monica Carol Miller was employed as a receptionist/legal assistant for respondent from October 1994 to May 1995. Miller testified that whenever she advised respondent that a telephone caller was interested in employment with the law firm respondent would ask, "Male or female?" If she told him the caller was male, it was commonplace for respondent to advise her to tell him to call back in two or three weeks, but if the caller was a female, respondent would often take the call.

{¶ 26} On one occasion respondent yelled at Miller for bringing him a glass of water that did not have ice in it. He used foul language and told her that she was stupid. Miller left respondent's employment after he said that everybody on his staff was stupid and "needed the shit knocked out of them."

{¶ 27} The panel concluded that respondent's conduct with respect to Crowe, Henn, and Seta violated DR 1-102(B) and 1-102(A)(6), in that he created a hostile work environment in his law office by virtue of the questions, touching of

female employees, and comments by him during the interview process and while the female employees worked for him as his law clerk and/or personal assistant. The panel also concluded that respondent's conduct with respect to Jennifer Crow violated DR 1-102(A)(6), and that respondent's conduct with respect to Crowe, Henn, and Seta also violated DR 9-101(C), in that he indicated that respondent could improperly influence the Board of Commissioners on Character and Fitness.

{¶ 28} In mitigation, the panel found that respondent is a devout practitioner of his religious faith and had been under stress after his mother died in 1995 because he had been very close to her and because he was attending religious services twice each day in her memory. The panel also found that respondent had not been the subject of prior disciplinary action by this court.

{¶ 29} Relator recommended that respondent be suspended from the practice of law for one year. Respondent recommended that he receive a public reprimand. The panel recommended that respondent be suspended from the practice of law in Ohio for two years, with the second year of the suspension stayed in favor of a one-year probation during which time respondent would be required to take courses on civility. The board adopted the findings of fact, conclusions of law, and recommendation of the panel.

————————————

*Manley*, *Burke & Lipton* and *Ann L. Lugbill*; *Clements, Mahin & Cohen, L.L.P.*, and *William E. Clements*; and *Edwin W. Patterson III*, General Counsel, Cincinnati Bar Association, for relator.

*Dinsmore & Shohl, L.L.P.*, *Mark A. Vander Laan* and *Matthew J. Morelli*; and *John H. Burlew*, for respondent.

*Jonathan E. Coughlan*, Disciplinary Counsel, and *Lori J. Brown*, First Assistant Disciplinary Counsel, in support of relator, for *amicus curiae*, Office of Disciplinary Counsel.

————————————

**DOUGLAS, J.**

{¶ 30} In disciplinary cases, this court renders the final determination of facts and conclusions of law. *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph one of the syllabus. After a thorough review of the record in this case we adopt the findings of fact of the board. We do not, however, adopt all of its conclusions of law. Specifically, we adopt the board's conclusion that respondent violated DR 1-102(B) (engaging, in a professional capacity, in conduct involving discrimination prohibited by law because of race, color, religion, age, gender, sexual orientation, national origin, marital status, or disability) and 1-102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law) by creating a hostile work environment for Crowe, but, while respondent's conduct was clearly inappropriate, we do not agree with the board's conclusion that respondent's conduct toward Henn and Seta created a hostile work environment.

{¶ 31} Moreover, we adopt the board's conclusion that respondent's conduct toward Jennifer Crow violated DR 1-102(A)(6). We also adopt the board's conclusion that respondent's comments to Crowe and Seta violated DR 9-101(C) (stating or implying that he was able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official). However, we reject the board's conclusion that respondent's statement to Henn violated DR 9-101(C).

{¶ 32} Each of these disciplinary code violations is addressed and discussed in detail below.

DR 1-102(B)

**{¶ 33}** This is the first case in which we have been called upon to apply DR 1-102(B) since its adoption in 1994. DR 1-102(B) provides that "[a] lawyer shall not engage, in a professional capacity, in conduct involving discrimination prohibited by law because of race, color, religion, age gender, sexual orientation, national origin, marital status, or disability."

**{¶ 34}** Respondent argues that the board erred in finding that he violated DR 1-102(B) for two reasons. First, respondent argues that DR 1-102(B) requires that the Ohio Civil Rights Commission ("OCRC"), the Equal Employment Opportunity Commission ("EEOC"), or a state or federal court make a preliminary finding of discrimination before an attorney can be charged with a violation of the rule. Because there was no such finding in this case, respondent argues that the board had no authority to find a violation of DR 1-102(B).

**{¶ 35}** Second, respondent argues that his conduct did not rise to the level of discrimination "prohibited by law." As explained more fully below, we find respondent's first argument to be without merit, but his second argument is well taken with respect to respondent's conduct toward Henn and Seta.

**{¶ 36}** Regarding respondent's first argument, that an attorney cannot be charged with a violation of DR 1-102(B) without a preliminary finding of liability by the OCRC, the EEOC, or a state or federal court, we note that the plain language of DR 1-102(B) does not require such a finding. If such a requirement were intended, then language to that effect would have been incorporated into the rule.

**{¶ 37}** Respondent argues that the language "prohibited by law" implies that a preliminary finding of liability is required. We disagree. The phrase "prohibited by law" is akin to the phrase "illegal conduct" in DR 1-102(A)(3) (a lawyer shall not engage in illegal conduct involving moral turpitude), and we do not require a conviction prior to finding that DR 1-102(A)(3) was violated. See, *e.g.*, *Disciplinary Counsel v. Clifton* (1997), 79 Ohio St.3d 496, 684 N.E.2d 33;

*Disciplinary Counsel v. Romaniw* (1998), 83 Ohio St.3d 462, 700 N.E.2d 858; and *Cincinnati Bar Assn. v. Deardorff* (1998), 84 Ohio St.3d 85, 702 N.E.2d 59.

{¶ 38} Also undermining respondent's argument that there must be a preliminary finding of discrimination are the differing standards of proof. The burden of proof in civil cases is by a preponderance of the evidence, whereas the burden of proof in disciplinary cases is by clear and convincing evidence. Gov.Bar R. V(6)(J). Therefore, even if an attorney were found liable for discrimination by a preponderance of the evidence in a civil case, the board, and ultimately this court, would still be required to make findings of fact and conclusions of law regarding the alleged discrimination under the clear-and-convincing-evidence standard.

{¶ 39} Next respondent argues that the board does not have the authority to make a determination of discrimination. In making this argument, respondent fails to recognize that the board was created by this court to review evidence and make findings and recommendations regarding disciplinary matters. Gov.Bar R. V; *Hecht v. Levin* (1993), 66 Ohio St.3d 458, 461, 613 N.E.2d 585, 588. In any event, assuming *arguendo* that respondent is correct, the board's findings and conclusions do not bind this court, as we render the final determination of the facts and conclusions of law. *Reid*, *supra*. Thus, it is this court, not the board, that determines whether certain conduct violates discrimination laws, and we are certainly authorized to make such a determination.

{¶ 40} Respondent also argues that there will be no time limitation for filing a grievance under DR 1-102(B) unless we hold that a finding of discrimination by the OCRC, the EEOC, or a state or federal court is a prerequisite to finding a violation of DR 1-102(B). This may be true, but disciplinary proceedings are not barred by or subject to general statutes of limitations. *Columbus Bar Assn. v. Teaford* (1966), 6 Ohio St.2d 253, 255, 35 O.O.2d 418, 419, 217 N.E.2d 872, 873.

{¶ 41} Based on the foregoing, respondent's first argument is not well taken. Accordingly, we hold that a finding of discrimination by the OCRC, the

EEOC, or a state or federal court is not a prerequisite to the board's finding that an attorney violated DR 1-102(B).

{¶ 42} We now move to respondent's second argument with regard to DR 1-102(B). As previously indicated, respondent contends in his second argument that his conduct did not rise to the level of discrimination "prohibited by law."

{¶ 43} The applicable state and federal statutes regarding discrimination are R.C. Chapter 4112 and Section 2000e, Title 42, U.S.Code, usually referred to as "Title VII." Our primary focus is on R.C. Chapter 4112 in this case because there is no dispute that respondent employed at least four persons as required by R.C. 4112.01(A)(2),[2] and the record indicates that respondent did not employ the necessary fifteen or more employees required to trigger application of Title VII. Section 2000e(b), Title 42, U.S.Code. If we determine that respondent's conduct in this matter violated R.C. Chapter 4112, then it follows that his conduct was "prohibited by law" and thus violated DR 1-102(B).

{¶ 44} R.C. 4112.02 provides that "it shall be an unlawful discriminatory practice: (A) [f]or any employer, because of the * * * sex * * * of any person, * * * to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The board concluded that respondent violated DR 1-102(B) by creating a hostile work environment for three of his former employees.

{¶ 45} Although we determined that Title VII is inapplicable in the instant matter, it has been our practice, where appropriate, to refer to federal case law interpreting Title VII in our analysis of R.C. Chapter 4112. *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202, 421 N.E.2d 128, 131 ("federal case law

---

2. R.C. 4112.01(A)(2) provides: " 'Employer' includes * * * any person employing four or more persons within the state * * *."

interpreting Title VII * * * is generally applicable to cases involving alleged violations of R.C. Chapter 4112"). In *Meritor Savings Bank v. Vinson* (1986), 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49, the court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. To establish that respondent created a hostile work environment, relator must show by clear and convincing evidence (1) that respondent subjected the alleged victim to unwelcome harassment, (2) that the harassment was based on the alleged victim's sex, and (3) that the harassment was sufficiently severe or pervasive as to create a hostile or abusive work environment.[3] See *Meritor*, 477 U.S. at 67-68, 106 S.Ct. at 2405-2406, 91 L.Ed.2d at 59-60, citing *Henson v. City of Dundee* (C.A.11, 1982), 682 F.2d 897. We discuss each of these elements separately with respect to each alleged victim beginning with Crowe.

{¶ 46} First, relator must prove that Crowe was subjected to unwelcome harassment. The federal EEOC regulations include verbal comments of a sexual nature in the definition of sexual harassment. Section 1604.11(a), Title 29, C.F.R. Several of respondent's comments to Crowe were clearly of a sexual nature, *e.g.*, telling her that she should be sleeping around.

{¶ 47} The record also indicates that Crowe did not welcome respondent's sexual comments. On the contrary, Crowe told respondent that his comments were "inappropriate" and made her "uncomfortable." Crowe also mentioned her boyfriend when respondent suggested that she should be his mistress. And when respondent suggested that he and Crowe go away together for a day to have sex, Crowe said, "That will never happen." These statements by Crowe represent clear

---

3. There are two additional elements required by case law. One is that the alleged victim belongs to a protected group. In cases of sexual discrimination, however, this requires a simple stipulation that the alleged victim is a man or a woman. *Henson v. City of Dundee* (C.A.11, 1982), 682 F.2d 897, 903. The other additional element is respondeat superior. This element is not relevant in this case because respondent is the alleged harasser.

indications that the sexual comments were unwelcome. Thus, the first element is met.

{¶ 48} Second, relator must show that the harassment was based upon Crowe's sex, *i.e.*, gender. Because respondent is male, Crowe is female, and several of respondent's comments were explicit or implicit proposals of sexual activity, *e.g.*, telling Crowe she should be sleeping around, that she would make a good mistress, and suggesting that Crowe go away with him to have sex, it is reasonable to assume that the harassment was based on Crowe's gender. *Oncale v. Sundowner Offshore Services, Inc*. (1998), 523 U.S. 75, 80, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201, 207-208.

{¶ 49} Finally, relator must show that the harassment created a hostile or abusive work environment. The United States Supreme Court emphasized in *Meritor* that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by the statute. *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405-2406, 91 L.Ed.2d at 60. Rather, to find a violation of Title VII, the harassment must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Id*. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 60, quoting *Henson*, 682 F.2d at 904.

{¶ 50} In *Harris v. Forklift Systems, Inc*. (1993), 510 U.S. 17, 21-23, 114 S.Ct. 367, 370-371, 126 L.Ed.2d 295, 301-303, the Supreme Court reaffirmed this standard and explained that the conduct in question must be evaluated under both an objective and a subjective standard. That is, the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively perceive the environment as hostile or abusive. For the reasons that follow, we determine that relator proved, by clear and convincing evidence, that respondent's conduct created a hostile environment with respect to Crowe under both prongs of *Harris*.

**{¶ 51}** Applying the subjective prong of *Harris* to the evidence in the case at bar, we find that Crowe perceived the work environment as hostile or abusive. Crowe testified that she felt sexually harassed, but felt there was no one to complain to about the situation. She testified that respondent's sexual comments shocked her and made her extremely uncomfortable. This was compounded by the fact that, as respondent's assistant, most of her time at work was spent with him.

**{¶ 52}** Also, Crowe testified that after she saw respondent berate and hit her female coworker, she felt physically threatened when he came very close and started yelling at her. Although this conduct was not sexual in nature, it demonstrated to Crowe that respondent was capable of physically assaulting his employees and added to Crowe's feeling of intimidation.

**{¶ 53}** In regard to the objective prong set forth in *Harris*, the court acknowledged that determining whether a reasonable person would consider an environment to be hostile or abusive is not susceptible of a "mathematically precise test." *Id*. at 22, 114 S.Ct. at 371, 126 L.Ed.2d at 302. The court did, however, provide some guidance by suggesting that the following factors should be considered: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Id.* at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302-303. The court stressed that this is a non-exhaustive list of factors and explained that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 23, 114 S.Ct. at 371, 126 L.Ed.2d at 302.

**{¶ 54}** In light of the foregoing and our consideration of the relevant factors in this matter, we conclude that a reasonable person would have found Crowe's work environment to be hostile and/or abusive. Respondent made frequent sexually harassing comments to Crowe. Crowe worked for respondent for less than twenty hours and during that time she was subjected to numerous sexual comments and

advances. Moreover, many of the comments were humiliating, *e.g.*, questioning her virginity, suggesting that he hired her to be his mistress, and telling another employee to determine what Crowe liked to drink so that he could take her away the following week and take advantage of her sexually.

{¶ 55} We find that respondent's comments would cause a reasonable person to feel uncomfortable and those feelings would only be exacerbated by the job duties as respondent's assistant, which required that most of Crowe's time at work be spent with him, either in his office, or in his car while accompanying him on errands. Certainly after witnessing respondent yell at and strike another female employee for not ending a telephone conversation, a reasonable person in Crowe's position would feel physically threatened.

{¶ 56} Furthermore, the surrounding circumstances that contributed to the hostility of the environment include respondent's frequent rages and verbal abuse of his employees, all of whom were women. Respondent yelled at his employees in the office nearly every day, often reducing the recipient of his anger to tears. Also significant is respondent's attempt to intimidate Crowe by suggesting that if she did not "behave" the way he wanted, he would give the Board of Commissioners on Character and Fitness a bad reference about her when she applied to take the Ohio Bar Examination. Taking all of the circumstances into account, we conclude that a reasonable person would have found Crowe's work environment to be hostile and/or abusive.

{¶ 57} Having found that relator proved by clear and convincing evidence that all of the elements of a hostile work environment were satisfied, we conclude that respondent's conduct toward Crowe constituted discrimination prohibited by law. Accordingly, we find that respondent's conduct violated DR 1-102(B).

{¶ 58} We now evaluate the board's conclusion that respondent's conduct with respect to Henn created a hostile work environment. The first element that relator must prove is that Henn was subjected to unwelcome harassment. The

federal EEOC regulations define sexual harassment as "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." Section 1604.11(a), Title 29, C.F.R. During Henn's interview, respondent told her that she was a cute girl and asked her if she had a boyfriend. In addition, after she was hired, respondent hugged Henn on several occasions.

{¶ 59} Although in some situations a hug is "physical conduct of a sexual nature," there are other situations where it is not. There is insufficient evidence in the record to indicate that the hugs in this case were of a sexual nature. In fact, the record reflects that respondent hugged Henn after he had yelled at her and she had become upset. Relator failed to prove by clear and convincing evidence that respondent's actions were of a sexual nature rather than just an attempt to console an upset employee. Moreover, the one comment respondent made to Henn is insufficient to constitute harassment.

{¶ 60} We find, therefore, that relator failed to prove that respondent's treatment of Henn satisfied the elements of a hostile work environment. Accordingly, we conclude that respondent's conduct toward Henn was not prohibited by law and, thus, we reject the board's conclusion that respondent violated DR 1-102(B) in his conduct toward Henn.

{¶ 61} We now turn to the board's conclusion that respondent's conduct with regard to Seta violated DR 1-102(B) by creating a hostile work environment. Seta worked for respondent for approximately three months. During that time, respondent once asked her whether she had a boyfriend. This is the only evidence in the record regarding respondent's conduct toward Seta that could be construed as "verbal conduct of a sexual nature." Clearly, this question, standing alone, fails to satisfy even the first element of a hostile work environment, *i.e*., that Seta was subjected to unwelcome harassment. Therefore, we reject the board's conclusion that respondent violated DR 1-102(B) in his conduct toward Seta.

DR 1-102(A)(6)

{¶ 62} DR 1-102(A) provides: "A lawyer shall not: * * * (6) Engage in * * * conduct that adversely reflects on the lawyer's fitness to practice law." We adopt the board's conclusion that respondent violated DR 1-102(A)(6) by creating a hostile work environment. Likewise, we adopt the board's conclusion that respondent violated this rule in his conduct toward Jennifer Crow.

{¶ 63} The board acknowledged that there was "considerable disagreement" between Crowe's and respondent's descriptions of the physical contact respondent had with Jennifer. However, the board did not explicitly describe the differing accounts nor did it state which account it found to be more credible. In Crowe's version of the incident, respondent struck Jennifer on the forehead with the palm of his hand and then struck her on the left side of her head while taking the telephone away from her.

{¶ 64} Respondent's version of the incident is markedly different. He adamantly claims that in reaching to take the telephone from Jennifer, he may have inadvertently touched her head with his finger.

{¶ 65} We find Crowe's description of the incident more credible in light of the reactions of all those present. Respondent testified that immediately after the incident he felt "so ashamed of [himself], so embarrassed, [for] bringing disrepute to [his] history and [his] family's history." Respondent also paid Jennifer $7,500 as a result of a confidential mediation settlement. Further, Jennifer cried, told respondent not to hit her again, called security, and initiated court proceedings against respondent. Finally, Crowe felt threatened by respondent and quit her job. All of these facts are more consistent with the incident as described by Crowe. Having determined that the incident happened as Crowe described it, we adopt the conclusion of the board that respondent's conduct with respect to Jennifer violated DR 1-102(A)(6).

DR 9-101(C)

{¶ 66} DR 9-101(C) provides: "A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official." The board concluded that respondent violated DR 9-101(C) by suggesting to Crowe, Seta, and Henn that he could improperly influence the Board of Commissioners on Character and Fitness based on his evaluations of them.

{¶ 67} With regard to his comments to Crowe and Seta, respondent argues that "[t]here is nothing improper about giving someone a poor recommendation if the person filling out the application feels the [bar] applicant did a poor job." We agree with this assertion; nevertheless, the facts in this case reveal that respondent's comments to Crowe and Seta were not based on job performance. The statement that respondent made to Crowe, *i.e.*, "Remember, you have to turn in your application and I'll make the worst of it for you," was made in response to Crowe's announcement that she quit her employment with respondent. There is no evidence in the record that respondent felt she had performed poorly in her job duties.

{¶ 68} Likewise, respondent's comment to Seta, that he would give a bad recommendation to the board regarding her employment, was not based on merit but was apparently made after Seta complained to respondent about making her sit in a chair all day with nothing to do. For the above reasons, we adopt the board's conclusion that respondent violated DR 9-101(C) with respect to Crowe and Seta.

{¶ 69} We do not, however, adopt the board's conclusion that respondent's comment to Henn constituted a violation of DR 9-101(C). Respondent told Henn that he would give her a "glowing recommendation" when she applied to take the bar exam, but there is no indication that respondent made this comment based on anything other than merit.

Sanction

{¶ 70} Despite rejecting some of the board's findings of Disciplinary Rule violations, we adopt its recommended sanction in this case because those violations

that were proven involved appalling conduct that is serious enough to support the recommendation. Furthermore, the mitigating factors in this case are not sufficient to reduce the sanction for respondent's egregious conduct. Accordingly, respondent is hereby suspended from the practice of law in Ohio for a period of two years, with the second year of the suspension stayed in favor of a one-year probation during which time respondent is required to take at least six hours of instruction related to professionalism. Gov.Bar R. X(3)(A)(1)(c). Costs taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in syllabus and judgment only.

———————————