**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Black***, Slip Opinion No. 2025-Ohio-1790.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2025-OHIO-1790

DISCIPLINARY COUNSEL *v*. BLACK.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Black*, Slip Opinion No. 2025-Ohio-1790.]**

*Attorneys—Misconduct—Violation of the Rules of Professional Conduct by engaging in conduct that adversely reflects on a lawyer's fitness to practice law—Two-year suspension with six months conditionally stayed.*

(No. 2024-1725—Submitted February 11, 2025—Decided May 22, 2025.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2024-012.

_____

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, DETERS, HAWKINS, and SHANAHAN, JJ.  BRUNNER, J., did not participate.

**Per Curiam.**

{¶ 1} Respondent, Ryan Richard Black, of Columbus, Ohio, Attorney Registration No. 0097679, was admitted to the practice of law in Ohio in 2018. Black was elected Hocking County prosecutor in November 2020 and took office in January 2021.

{¶ 2} In an April 2024 complaint, relator, disciplinary counsel, charged Black with three counts of misconduct arising from acts that occurred during his tenure as Hocking County prosecutor. The first count alleged that Black engaged in inappropriate sexual conduct with two employees of the prosecutor's office. The other two counts alleged that Black engaged in an inappropriate sexual relationship with a client of the prosecutor's office and that he inappropriately used his public office by threatening to arrest the Hocking County information-technology director for obstructing official business after the director refused to stop what he was doing to fix a computer issue for the prosecutor's office.

{¶ 3} The parties entered stipulations of fact, and Black agreed that his inappropriate sexual conduct with the two employees violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). The parties also stipulated to aggravating and mitigating factors and submitted 14 stipulated exhibits. In addition, they agreed that the appropriate sanction for the stipulated misconduct is a two-year suspension with six months stayed on conditions primarily related to Black's mental health.

{¶ 4} Black and one other witness testified at a hearing before a three-member panel of the Board of Professional Conduct. Following the hearing, the panel unanimously voted to dismiss the second and third counts of relator's complaint. Based on the stipulations and evidence presented at the hearing, the panel found that Black's inappropriate sexual conduct with the two employees adversely reflected on his fitness to practice law. The panel recommended that he be suspended from the practice of law for two years, with six months conditionally

stayed, and that certain conditions be placed on his reinstatement to the practice. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. No objections have been filed.

{¶ 5} After reviewing the record and our relevant precedent, we adopt the board's finding of misconduct and its recommended sanction.

## FINDINGS OF FACT AND MISCONDUCT

### *General Office Conduct*

{¶ 6} After taking office as the Hocking County prosecutor in January 2021, Black created an unprofessional work environment through his inappropriate language and behavior. His use of obscenities and inappropriate sexual comments made staff members uncomfortable. For example, while interviewing two candidates for jobs in the prosecutor's office, Black asked whether they would mind the use of the word "fuck" in the office or receiving "dogshit pay."

{¶ 7} Black's office behavior was erratic. He frequently engaged in screaming outbursts and refused to speak to staff members for several days at a time. At least one employee was frightened of him and avoided being around him. Black stipulated that if A.T., who worked as an assistant prosecutor in his office beginning in November 2022, had been called as a witness, she would have testified that Black "disparaged and exploited employees."

{¶ 8} In A.T.'s affidavit, a stipulated exhibit in this case, she avers, "Throughout my time at the prosecutor's office, I have preferred to work outside of regular work hours or work from home whenever possible to avoid the chaos." She further averred that she "came in only as necessary for [her] court hearings if [Black] was in the office." She also stated that she "built a wall of bookshelves" around her workspace in an attempt to "hide away" and "just do [her] job."

{¶ 9} Although Black was not charged with any misconduct arising from these facts, they nonetheless offer some insight into Black's leadership and the office culture in which the alleged misconduct occurred.

*Inappropriate Sexual Conduct Involving S.R.*

**{¶ 10}** S.R. worked as a Hocking County assistant prosecutor from January through November 2021. During S.R.'s employment, Black, who was S.R.'s supervisor, made inappropriate sexual comments to S.R. and to others about S.R. On one occasion, in front of a colleague at work in March 2021, Black told S.R. that her dress made him want her to "wrap [her] legs around [his] face until [she] orgasmed," then did an impression of himself performing oral sex.

**{¶ 11}** On July 20, Black sent S.R. a text message containing a photograph of himself shirtless because he was looking for compliments. He later added: "[T]hank you for being complimentary. It certainly makes my day and definitely keeps me motivated to keep working lol. Means a lot." The next day, Black and S.R. attended a party. The host asked S.R. whether she wanted to feed his pet donkey a carrot. Black interjected with a sexual innuendo, stating that he had a "carrot" that he would like to feed S.R. He later sent S.R. a text message containing four carrot emojis.

**{¶ 12}** Black and S.R. also exchanged text messages concerning Black's plan to seek a salary increase on S.R.'s behalf. Black told S.R. that he would try to increase her salary "to the low- to mid-70s," before stating, "Now, that said, I'd give ya 200k if it meant I got flattered all the time 🐱." He later added: "Besides I don't want some fancy county going and offering you more money for less stress and stealing you away! I'd only be able to counter that other counties probably have less guns and carrots. . . And abs you can occasionally belly rub when you're bored or feeling down hahahaha." (Punctuation in original.) By the end of July, Black texted S.R. three more photographs of himself shirtless.

**{¶ 13}** S.R. left her employment in the prosecutor's office in November 2021.

*Inappropriate Sexual Conduct Involving K.V.*

**{¶ 14}** In April 2021, Black hired K.V. to work as a victim advocate in the prosecutor's office. He was her supervisor.

**{¶ 15}** K.V. discovered that she was unexpectedly pregnant in early 2022. When she told Black about her pregnancy, he joked about helping her terminate it. Later, after hearing that she had suffered a miscarriage, he joked about that as well.

**{¶ 16}** In May 2022, Black began to send K.V. inappropriate text messages. On one occasion, K.V. sent Black a text saying that she had bought new clothes and was feeling self-conscious about wearing them; he responded, "If you look dashing and I grope you, don't sue me lmao."

**{¶ 17}** Among numerous text messages in June, Black sent K.V. a link to a sexually explicit song titled "Pussy" by the German band Rammstein as well as images of two cats cuddling. K.V. responded to one of the images with a text stating, "Cats making out this time[,] aye? 😹😹😹😹😹." Black replied, "Lol throwing out hints 🤫." In another text conversation, K.V. stated that she was going to a police department to discuss a protection order. Black stated that he needed to go there, too. K.V. responded, "Sounds like a date! I'll be waiting." Black replied, "Lol ok." And then he added, "I feel like I missed an opportunity there for a dirty comment. Damn it."

**{¶ 18}** On July 14, Black disclosed to K.V. certain information regarding his mental health. After making those disclosures, Black sent K.V. a text informing her that he would be working closely with her and another employee to manage the effects of his mental health on the office. K.V. responded, "I'm ready for it . . . I'll work as close as you want 🙈😂🥴." Black replied, "That sounds promising . . . . Again, careful whatcha ask for. Might get what you want lol." (Ellipsis in original.) In a later text, Black asked K.V., "Want a progress physique pic since you didn't get any last summer of your own? 🙀🙀🙀 Can consider it a bonus for good

work." K.V. replied, "😂😂😂😂😂 [A]bsolutely." Black cautioned K.V. that she was not to share the image, and then he texted her a photograph of himself shirtless.

{¶ 19} While at a hearing the next day, Black sent K.V. a text message stating that he would let her know when he would be able to leave court for a cigarette break. Shortly thereafter, he texted to inform her that he was outside, K.V. replied, "Coming." Black replied, "Oooh say that again lol." Black has stipulated that his response was "sexually charged and a reference to ejaculation." In a text exchange about desserts later that evening, Black told K.V., "Can't compare ice cream dessert to cake brownie desserts. They're like different languages. But I can make comments about eating your brownie all night 😈."

{¶ 20} On July 16, Black asked K.V. whether she was going out with two other prosecutor's-office employees that night, stating that he might stop by with his fiancée to pay their tab. He told K.V. not to ruin the surprise and not to misbehave. K.V. responded that she would not ruin the surprise but that she could not promise she would not misbehave. Black replied, "Well at least try. No fun if I can't participate in debauchery! Make sure a tab[']s started and I'll pay what's on it when [my fiancée] and I get there. Probably stay here another 45m-hour then we'll come and [my fiancée] will have a beer with you gals and I'll make inappropriate comments." Black then sent K.V. another shirtless photograph of himself, this time with a towel wrapped around his waist.

{¶ 21} Black met K.V. and another employee at a local bar that night and drove them home. The next day, he sent K.V. a text stating, "I'll play [designated driver] for you ladies any time." K.V. responded that Black should not say that too loud because they "might take advantage of [him] on the [designated driver] aspect." Black replied, "I like the 'take advantage of you' part . . . 😈 Lol." (Ellipsis in original.)

{¶ 22} Black continued to initiate sexually charged and suggestive conversations with K.V. Around August 2022, Black told K.V. that he wanted the female employees of the prosecutor's office to wear bikinis to move a couch into his office. Once he had moved the couch there himself, he also told her that he planned to use it as a "casting couch" and insinuated that he was going to video record sexual activity on it. In addition, K.V. once heard Black refer to the couch as the "porn couch."

{¶ 23} On August 2, K.V. texted Black to let him know that she had had a dream about him and that it was "intense." Black responded: "Damn. What an excellent start to my day[;] I'm super flattered and all blushy now lol[.] Kinda sad it was just a dream tho." Then he texted: "And no shit that Rammstein song just came up on my shuffle. Weird coincidence!" K.V. replied, "😂😂😂😂😂 [T]he [L]ord[']s work . . . over here getting us in trouble 😂😂😂." (Ellipsis in original.) Black responded, "Only trouble if we got caught 😈." They agreed to meet for lunch the next day to "talk about the possibility."

{¶ 24} On August 4, during lunch at a restaurant where he had taken K.V., Black proposed that they begin a sexual relationship. Several days later, they had sex. They later texted about the experience. Over the next several days, Black continued to send K.V. text messages soliciting additional sexual activity. He also suggested that they engage in sexual conduct in the prosecutor's office, texting, "We're definitely going to have to make use of that couch at some point."

{¶ 25} Black has stipulated that if K.V. had been called as a witness, she would have testified that he pressured her into having sex again on August 17. After that encounter, Black continued to text K.V., pressuring her to engage in additional sexual activity. Initially, K.V. offered reasons why she could not meet Black. Then, for several days, she stopped responding to his texts seeking to schedule another rendezvous. On September 11, K.V. claimed that she had not been ignoring

Black but that her phone had been missing. Black responded the next day with a text stating, "Like that top you had on . . . ." (Ellipsis in original.) K.V. replied with a meme that said, "Oh, stop it."

{¶ 26} K.V. left her employment with the prosecutor's office around April 2023. K.V. and another former prosecutor's-office employee later filed a lawsuit against Black, alleging that he had created a hostile work environment. The case was settled out of court and dismissed. Black ultimately resigned his position as the Hocking County prosecutor.

{¶ 27} The parties stipulated and the board found by clear and convincing evidence that Black's inappropriate sexual conduct involving K.V. and S.R. adversely reflects on his fitness to practice law, in violation of Prof.Cond.R. 8.4(h). We adopt this finding of misconduct and find that Black's pattern of sexual misconduct involving two prosecutor's-office employees who reported to him falls within this catchall provision. *See Disciplinary Counsel v. Bricker*, 2013-Ohio-3998, ¶ 21.

## SANCTION

{¶ 28} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

### *Aggravating and Mitigating Factors*

{¶ 29} In this case, the parties stipulated to, and the board found, three aggravating factors—that Black acted with a dishonest or selfish motive, engaged in a pattern of misconduct, and harmed vulnerable victims. *See* Gov.Bar R. V(13)(B)(2), (3), and (8). Mitigating factors stipulated by the parties and found by the board consist of the absence of prior discipline, Black's cooperative attitude toward the disciplinary proceedings, and other interim rehabilitation in the form of

the mental-health and alcohol-abuse treatment discussed below. *See* Gov.Bar R. V(13)(C)(1), (4), and (8).

{¶ 30} The board also found that several additional mitigating factors are present. First, Black accepted responsibility for his misconduct. He testified that the Hocking County Prosecutor's Office "was one of the most, if not the most, unprofessionally run office[s] in the state, and that was entirely [his] responsibility, and is absolutely disgusting to [him] that [he] would permit that." He described his behavior toward K.V. and S.R. as "inappropriate," "embarrassing," "shameful," and—in light of his supervisor position—"grotesque." He further testified: "I can't apologize enough for the fact that I made people feel that way . . . . I fostered an environment that was beyond unprofessional and unacceptable."

{¶ 31} Second, the board acknowledged that Black had submitted two letters attesting to his good character and reputation. *See* Gov.Bar R. V(13)(C)(5). One of those letters was from a criminal-defense attorney who had represented defendants in "a multitude of criminal cases" that Black had prosecuted. He stated that Black had "consistently demonstrated . . . an obvious commitment to deliver fair and even-handed justice when practicable" as well as "professionalism, integrity, and an overall positive attitude, which greatly enhanced the ability of the parties to reach an expeditious resolution on any number of case(s)." The other letter was from a woman who worked in the prosecutor's office for about a year following K.V.'s resignation—first as a victim advocate, then as an office manager. She stated that she "did not witness any behaviors that had been reported by previous staff" and that she "would work for [Black] again if a chance presented itself."

{¶ 32} Third, the board noted that under Gov.Bar R. V(13)(C)(9), an elected or appointed judge's voluntary resignation from office before the commencement

of disciplinary proceedings may be considered as a mitigating factor.[1] Although Black was an elected prosecutor—not a judge—the board noted that Gov.Bar R. V(13)(A) directs it to consider "all relevant factors" in determining the appropriate sanction for an attorney's misconduct. The board concluded that in the spirit of Gov.Bar R. V(13)(C)(9), an elected prosecutor's voluntary resignation from that position before the commencement of disciplinary proceedings warrants mitigating effect. We agree that considering all relevant factors under Gov.Bar R. V(13)(A), Black's voluntary resignation from his position as an elected prosecutor warrants some mitigating effect in this case.

*Mental-Health and Substance-Use Issues*

{¶ 33} Under Gov.Bar R. V(13)(C)(7), mental and substance-use disorders may be considered as mitigating factors when four factors are present: (1) a qualified healthcare or chemical-dependency professional's diagnosis of a disorder, (2) a determination that the disorder contributed to cause the misconduct, (3) a sustained period of successful treatment for a mental disorder or a certification of the successful completion of an approved treatment program for a substance-use disorder, and (4) a prognosis from a qualified healthcare or chemical-dependency professional that the attorney will be able to return to the competent, ethical, and professional practice of law under specified conditions.

{¶ 34} Although Black presented extensive evidence regarding his mental health and alcohol abuse, he testified that he did not seek to establish any mental or substance-use disorder as a mitigating factor in this case. That evidence is nevertheless relevant to his state of mind when he engaged in his misconduct and to his ability to resume the competent, ethical, and professional practice of law.

{¶ 35} Although he was sober during the period when he was engaging in the professional misconduct described above, Black has a lengthy history of

---

1. This mitigating factor was adopted by this court on September 9, 2020, and became effective on November 1, 2020. 159 Ohio St.3d LXXXVII, XCV.

abusing alcohol. During his disciplinary hearing, he testified that he drank heavily as an undergraduate and that "alcohol rehabilitation failure" later contributed to his medical discharge from the United States Coast Guard.

{¶ 36} Black testified that he was arrested in October 2010 for operating a vehicle while intoxicated "with an exceedingly high [blood-alcohol content]." Thereafter, his experience living in a halfway house sparked his interest in attending law school. In 2013, he started a ten-year stretch of sobriety after completing an inpatient-treatment program. Black testified that after he got sober, he still did not feel "quite right." He experienced "very euphoric" manic episodes that he had attributed to hyperactivity and productivity, but he also experienced "crushing depression," which he described as "a complete collapse into despondency." Concerned about the swing from productivity to depression, he sought help from a mental-health professional and was diagnosed with bipolar disorder.

{¶ 37} Black passed the bar exam in 2018 and had very limited experience as a lawyer—including just nine months of experience as an assistant prosecutor in Vinton County—when he took office as the Hocking County prosecutor on January 4, 2021. The job turned out to be "significantly more" to manage than Black had anticipated that it would be. He testified that he had "an extremely stressful and mostly traumatic introduction to the job," immediately making him feel that he was "in over [his] head." Black endured numerous stressors after graduating from law school, starting with the illness and death of his first fiancée in January 2018. His mother died in November 2021, and his father suffered a massive stroke in April 2022—shortly before Black began inappropriately texting K.V.

{¶ 38} Following a roughly ten-year period of sobriety, Black began drinking alcohol again in October 2023. He voluntarily sought treatment for his mental health and alcohol abuse in December 2023 and entered into a mental-health recovery contract with the Ohio Lawyers Assistance Program ("OLAP") in January 2024. He completed an inpatient-treatment program in March 2024. In addition to

"bipolar disorder-unspecified," he was diagnosed with agoraphobia with panic disorder.

{¶ 39} At the time of his disciplinary hearing, Black was participating in counseling with Steven Gifford, M.Ed., L.P.C.C., L.I.C.D.C.-C.S. Black was also regularly attending Alcoholics Anonymous meetings and participating in intensive outpatient treatment through an alcohol- and drug-treatment center. Gifford testified that Black had been taking lithium for approximately ten years but that it was no longer effectively treating his bipolar disorder and that his agoraphobia and panic disorder had gone untreated. Gifford also testified that there was a direct correlation between Black's diagnosed and untreated mental disorders and the misconduct at issue in this case.

{¶ 40} According to Gifford, Black may not be able to control his impulses during his manic episodes and could act without fully thinking through a situation and the ramifications of his behavior. Gifford explained that bipolar disorder is often associated with hypersexuality and that Black may have been "seek[ing] out sexual partners without thinking through . . . if that's an appropriate relationship or not." Gifford further testified that in response to uncomfortable or overwhelming situations, Black abused alcohol. Indeed, Black himself testified that looking back, he realized that his drinking would usually follow a deterioration of his mental health and that he believed it to be "almost an intentional self-destructive device."

{¶ 41} Black suffered a relapse and began drinking alcohol again in August 2024—the month before his disciplinary hearing. Gifford opined, however, that Black could return to the competent, ethical, and professional practice of law "as long [as he] continues with medications and therapeutic interventions."

{¶ 42} Although the board found that Black's disorders do not satisfy the requirements of Gov.Bar R. V(13)(C)(7) due to his August 2024 relapse into alcohol abuse, the board nonetheless acknowledged his efforts to address his

mental-health and alcohol-use disorders. Moreover, the parties and the board have addressed those disorders in their recommended sanction.

*Relevant Precedent and Recommended Sanction*

**{¶ 43}** The parties have acknowledged that Black needs additional mental-health and addiction treatment and time to recover before he is fit to resume the practice of law. Therefore, they have stipulated that the appropriate suspension in this case is a two-year suspension with six months stayed on the conditions that Black (1) commit no further misconduct, (2) submit to relator quarterly reports from his mental-health and substance-abuse counselors regarding his compliance with treatment recommendations, and (3) enter into an OLAP substance-abuse contract that requires random drug and alcohol testing.

**{¶ 44}** In support of that recommendation, the board primarily relies on four cases in which we imposed one- or two-year suspensions that were partially—or, in one case, fully—stayed on conditions.

**{¶ 45}** In *Lake Cty. Bar Assn. v. Mismas*, 2014-Ohio-2483, shortly after interviewing a law student to work for him as a law clerk, an attorney sent her inappropriate text messages suggesting that she perform sexual favors for him and representing that her employment would depend on her compliance. After the student began working for him, Mismas pressured her to travel out of state with him. The law clerk resigned after less than two weeks of employment. Just two aggravating factors were present: Mismas acted with a selfish motive and caused harm to a vulnerable victim. *Id.* at ¶ 18. Mitigating factors consisted of Mismas's clean disciplinary record, his remorse and good-faith effort to rectify the consequences of his misconduct, his cooperation in the disciplinary proceedings, his good character and reputation, and the existence of a qualifying substance-use disorder. *Id.* at ¶ 15-17. Recognizing that Mismas's misconduct harmed not only the law clerk but also the dignity and reputation of the legal profession as a whole,

we suspended Mismas from the practice of law for one year with six months conditionally stayed. *Id.* at ¶ 23, 26.

{¶ 46} We also imposed a one-year suspension with six months conditionally stayed in *Disciplinary Counsel v. Skolnick*, 2018-Ohio-2990. Skolnick berated, verbally harassed, and humiliated his paralegal for more than two years. In addition to criticizing her appearance and education, making fun of her mother, and calling her "stupid, dumb, fat, 'whorey,' and bitch," he proposed that she and another employee perform a sexual act on him so that he could rate their performances. *Id.* at ¶ 4-5. Just two aggravating factors were present: a pattern of misconduct and harm to a vulnerable employee who could not afford to quit her job until she secured new employment. *Id.* at ¶ 4, 9. Mitigating factors consisted of Skolnick's clean disciplinary record, good character, cooperation in the disciplinary process, acknowledgment of his misconduct, and expression of remorse. *Id.* at ¶ 9. Although Skolnick presented some evidence that he had been diagnosed with a mental disorder, like Black, he did not establish it as a mitigating factor. *See id.*

{¶ 47} In *Disciplinary Counsel v. Bennett*, 2023-Ohio-4752, we imposed a conditionally stayed two-year suspension on an attorney who, while serving as an assistant United States attorney, sexually harassed a legal intern. Bennett had conversations with the intern about his sex life, asked about hers, and suggested that he could be her sexual partner. He solicited nude photographs from her, and on one occasion, he inappropriately touched her breasts with the back of his hand while maintaining eye contact with her. He also implicitly conditioned his compliance with her request for a professional reference on her willingness to provide sexual favors. Bennett's communications with the intern through various media eventually led her to block his telephone number and social-media accounts.

{¶ 48} Like Black, Bennett acted with a dishonest or selfish motive and harmed a vulnerable victim. *See id.* at ¶ 21. He also had a clean disciplinary record, cooperated in the disciplinary investigation, presented evidence of his good

character and reputation, and had other sanctions imposed for his misconduct—namely, the loss of his employment. *Id.* Although Bennett presented evidence of two mental disorders, he did not establish either as a mitigating factor. *Id.* at ¶ 22.

{¶ 49} The board recommended that Bennett be suspended from the practice of law for six months. We distinguished the facts of Bennett's case from those of *Mismas* on the ground that a substantial sanction had already been imposed for Bennett's misconduct, and we concluded that it would be inequitable to impose an actual suspension equal to the unstayed portion of Mismas's suspension. Expressing concern based on Bennett's admission that his misconduct may have been more widespread, we concluded that a conditionally stayed two-year suspension would best protect the public by giving Bennett an incentive to comply with his treatment regimen while affording us the opportunity to revoke the stay if he violated any of its conditions or committed further misconduct. *Id.* at ¶ 53-55.

{¶ 50} Finally, in *Cincinnati Bar Assn. v. Young*, 2000-Ohio-160, an attorney committed multiple ethical violations by verbally abusing several employees, several of whom were also students. Among other things, he made comments directly and indirectly suggesting he was sexually interested in the student-employees, suggested that he could positively or negatively affect their future bar admissions, and inappropriately touched at least one of them. We found that Young's conduct adversely reflected on his fitness to practice law, implied that he could improperly influence a tribunal, and constituted impermissible gender discrimination. No aggravating or mitigating factors were specified in our opinion. We imposed a two-year suspension with one year stayed on the conditions that he serve one year of probation and receive at least six hours of instruction on professionalism. *Id.* at ¶ 70.

{¶ 51} Despite the similarities between Black's misconduct and the misconduct at issue in *Mismas*, *Skolnick*, *Bennett*, and *Young*, the board noted one important distinction: Black was an elected county prosecutor when he committed

his misconduct. "'There must be no misunderstanding that the legal profession demands adherence to the highest standards of honesty and integrity[,] and lawyers who hold public office must be especially scrupulous in this regard.' " *Disciplinary Counsel v. Taft*, 2006-Ohio-6525, ¶ 14, quoting the board's report in that case. In *Disciplinary Counsel v. Dann*, 2012-Ohio-5337, ¶ 23, we stated, "Like judges, the attorney general has a heightened duty to the public by virtue of his elected office." We recognized in that case that just as "misconduct committed by a judge vested with the public's trust causes incalculable harm to the public perception of the legal system," *id.* at ¶ 22, citing *Disciplinary Counsel v. Hoskins*, 2008-Ohio-3194, ¶ 81, an attorney general's ethical violations not only reflected poorly on his fitness to practice law and on the legal profession as a whole but also caused "incalculable harm" to the public perception of his office, *id.* at ¶ 23.

{¶ 52} In this case, we agree that Black must be held to a higher standard because he was the elected Hocking County prosecutor at the time of his misconduct. We therefore agree that the appropriate sanction for his misconduct is a two-year suspension with just six months stayed on the conditions recommended by the board.

**CONCLUSION**

{¶ 53} Accordingly, Ryan Richard Black is suspended from the practice of law in Ohio for two years with six months stayed on the conditions that he (1) commit no further misconduct, (2) submit to relator quarterly reports from his mental-health and substance-abuse counselors regarding his compliance with treatment recommendations, and (3) enter into and comply with an OLAP contract that includes a requirement of random drug and alcohol testing. If Black fails to comply with any condition of the stay, the stay will be lifted and he will serve the full two-year suspension. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(24), Black shall be required to submit from a qualified healthcare

professional an opinion stating that Black can return to the competent, ethical, and professional practice of law.  Costs are taxed to Black.

Judgment accordingly.

——————————

Joseph M. Caligiuri, Disciplinary Counsel, and Karen H. Osmond and Ryan N. Sander, Assistant Disciplinary Counsel, for relator.

UB Greensfelder, L.L.P., and Alvin E. Mathews, for respondent.

——————————