[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Bennett*, Slip Opinion No. 2023-Ohio-4752.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2023-OHIO-4752

DISCIPLINARY COUNSEL *v.* BENNETT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Bennett*, Slip Opinion No. 2023-Ohio-4752.]**

*Attorneys—Misconduct—Violation of the Rules of Professional Conduct—Conditionally stayed two-year suspension.*

(No. 2023-0471—Submitted June 28, 2023—Decided December 29, 2023.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2022-034.

_____

**Per Curiam.**

{¶ 1} Respondent, Mark Stewart Bennett, of Westlake, Ohio, Attorney Registration No. 0069823, was admitted to the practice of law in Ohio in 1998.

{¶ 2} In an August 2022 complaint, relator, disciplinary counsel, alleged that Bennett had engaged in conduct that adversely reflected on his fitness to practice law in violation of Prof.Cond.R. 8.4(h) by sexually harassing an intern who

was working for his employer. The parties entered into stipulations of fact, misconduct, and aggravating and mitigating factors, and they submitted eight stipulated exhibits. They also jointly recommended that Bennett receive a stayed six-month suspension from the practice of law for his misconduct.

{¶ 3} Bennett and one other witness testified at a hearing before a three-member panel of the Board of Professional Conduct. After the hearing, the panel issued a report finding that Bennett had committed the charged misconduct and recommending that he be suspended from the practice of law for six months with no stay and that we place a condition on his reinstatement to the profession. The board adopted the panel's findings of fact, conclusions of law, and recommended sanction. Bennett objects to the board's recommended sanction, arguing that the board erred in (1) recommending that he serve an actual suspension from the practice of law and (2) considering cases in which we have disciplined attorneys who have committed similar misconduct *with clients* in determining the appropriate sanction for his misconduct.

{¶ 4} For the reasons that follow, we adopt the board's findings of misconduct, sustain Bennett's first objection in part, overrule his second objection, and suspend him from the practice of law for two years with the entire suspension stayed on the conditions that he commit no further misconduct, that he continue with his current course of mental-health counseling for the duration of his suspension, and that in the event his treating professional determines that his counseling is complete before he has fully served his suspension, he report to the Ohio Lawyers Assistance Program ("OLAP") and comply with any OLAP recommendations.

**MISCONDUCT**

{¶ 5} During all times relevant to this proceeding, Bennett was employed as an Assistant United States Attorney ("AUSA") at the Cleveland or Akron office of the United States Attorney's Office for the Northern District of Ohio ("USAO").

**{¶ 6}** J.S. was 24 years old and had just finished her first year of law school when she commenced an internship at the Akron office of the USAO in May 2017. She left that internship in November 2017 but returned to serve as an intern at the Youngstown office of the USAO from August 2018 until June 2019. During the two internships, J.S. spent time working at the Cleveland, Akron, and Youngstown offices of the USAO.

**{¶ 7}** J.S. became acquainted with Bennett during her 2017 internship. At that time, Bennett had been an AUSA for approximately ten years. During that internship, J.S. believed that on various occasions, Bennett had attempted to look up her skirt and had been "looking at [her] butt." She also heard from a male intern that Bennett had made sexually inappropriate comments about her.

**{¶ 8}** During J.S.'s 2017 internship, Bennett had consensual conversations with her about his marital sex life. He also asked J.S. about her sex life and suggested that he could be her sexual partner. Bennett offered to buy clothing for J.S. from several stores, including Victoria's Secret, and asked her to send him nude photos of herself on Snapchat, a social-media platform.

**{¶ 9}** In August or September 2017, Bennett and J.S. were in the library of the Akron office when J.S. told Bennett that she needed a copy of the federal sentencing guidelines. Bennett told J.S. where the book was, and as he reached across her body as if he was going to retrieve the book from a cabinet, he touched her breasts with the back of his hand. J.S. believed that the touching was intentional because Bennett made and held eye contact with her during the touching. Bennett held the back of his hand on J.S.'s breasts and removed his hand when another attorney entered the library.

**{¶ 10}** At some point, Bennett began communicating with J.S. through various media, including Snapchat, Facebook, and text messaging. J.S. eventually stopped Bennett's attempts to communicate with her by refusing Snapchat requests, blocking his phone number, and blocking him on Facebook. When Bennett

questioned J.S. about her accounts not being visible to him on social media, she feigned ignorance.

{¶ 11} J.S. left the USAO in November 2017, but she reached out to Bennett in 2018 to ask whom she should contact about returning to work at the office. In response, Bennett asked what J.S. was willing to do to return to the office. J.S. believed that Bennett's question had sexual overtones, and she did not pursue the matter any further with him.

{¶ 12} When J.S. was reappointed as a USAO intern in August 2018, she asked to be assigned primarily to the Youngstown office rather than where Bennett was stationed (either the Akron office or the Cleveland office). On the occasions when she worked at the Akron office, she stated that she disliked interacting with Bennett so much that she would leave the area when she saw him looking for her. She also asked a colleague to let her use the colleague's workstation so that Bennett would not know that she was in the office.

{¶ 13} In January 2019, Bennett sent J.S. a text message asking why she loved Youngstown so much and whether she was "back with the same guy," to which J.S. replied "mayyybeeeeee." (Spelling sic.) In the text exchange that followed, Bennett noted that J.S. was spending two more hours commuting than necessary, told her that her relationship with her boyfriend "obviously didn[']t work out the first time," and inquired about her sex life with her boyfriend by asking "is IT really that good??" (Capitalization and punctuation sic.) J.S. shut down the conversation, texting "omg im getting back to work," to which Bennett replied, "[F]ine…what do i care anyway if u flunk out…." (Spelling, capitalization, punctuation, and ellipses sic.)

{¶ 14} In January or February 2019, J.S. asked Bennett to provide a letter of recommendation in support of an application for a clerkship following her graduation from law school. After Bennett responded to her request by asking what

he would receive in exchange for the recommendation, J.S. abandoned her request and obtained recommendations from other attorneys.

{¶ 15} In March 2019, Bennett sent J.S. a Facebook message at around 4:00 a.m., asking, "Why do you haunt my dreams?" He continued to send J.S. text messages that were unwelcome and ignored. On one occasion in June 2019, Bennett sent J.S. a text, stating, "Nice. Can[']t wait to have it," in reference to J.S.'s butt, which he informed her "was looking wide for a while there." He later texted her, "Damn [you] for making me think about it again," with "it" being a reference to sexual activity.

{¶ 16} After J.S. informed a colleague about her interactions with Bennett, the Office of the Inspector General ("OIG") of the United States Department of Justice investigated her allegations. During that investigation, J.S. stated that she had chosen not to report Bennett's conduct, because according to how she had been raised, "[T]his is what you have to deal with and you don't say anything because then you're going to hurt your chances at a career." She also stated, "I can't put my foot down because I'm an intern and he would always be like, oh I play poker with judges every Thursday and I'm so well connected." Although J.S. admitted that she has a flirtatious personality and that she had probably joked with Bennett about being his mistress in the early part of their interactions, she did not believe that she had misled him into believing that she wanted a sexual relationship with him or that she was receptive to his sexual comments.

{¶ 17} When he was interviewed during OIG's investigation, Bennett stated that he had been unaware that J.S. was uncomfortable with his conduct and that he had believed that his interactions with her were mutually acceptable. In his stipulations and his disciplinary-hearing testimony, he admitted that his actions were inappropriate and stated that he had not realized how offensive they were to J.S.

{¶ 18} After completing its investigation, the OIG concluded that Bennett had violated Department of Justice sexual-harassment policy and recommended that his employment be terminated. Believing that he would be terminated even if he contested the proceedings, Bennett resigned from the USAO and reported his actions to relator. A short time later, the Department of Justice informed relator of its investigation.

{¶ 19} The parties stipulated and the board found by clear and convincing evidence that Bennett's conduct violated Prof.Cond.R. 8.4(h) (prohibiting other conduct that adversely reflects on a lawyer's fitness to practice law, even though that conduct is not expressly prohibited by another rule).

### RECOMMENDED SANCTION

{¶ 20} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 21} The parties stipulated and the board found that two aggravating factors are present in this case: Bennett had acted with a dishonest or selfish motive and had harmed a vulnerable victim. *See* Gov.Bar R. V(13)(B)(2) and (8). As for mitigating factors, the parties stipulated and the board agreed that Bennett had a clean disciplinary record, that he had made full and free disclosure to the board and presented evidence of his good character and reputation, and that other penalties or sanctions had been imposed for his misconduct—namely, the loss of his employment. *See* Gov.Bar R. V(13)(C)(1), (4), (5), and (6).

{¶ 22} During his disciplinary-hearing testimony, Bennett expressed regret and remorse for his misconduct toward J.S. He stated that he would like to apologize to J.S. for his misconduct but that he had been advised to have no communication with her. Bennett explained that he had voluntarily sought counseling to understand why he had engaged in inappropriate conduct with J.S.

and that he had learned how to set appropriate professional boundaries and put himself in others' shoes. His licensed professional clinical counselor testified that she had diagnosed Bennett with anxiety and depression. She stated that she continues to meet with Bennett about once a month for treatment and that he had been making progress in his treatment. The board found, however, that Bennett had not offered his disorders as a mitigating factor. And we note that there is no evidence that those disorders contributed to cause Bennett's misconduct, as required by Gov.Bar R. V(13)(C)(7)(b).

{¶ 23} The parties recommended that Bennett be suspended from the practice of law for six months with the entire suspension stayed on the conditions that he commit no further misconduct and that he continue his current course of mental-health counseling. In determining the appropriate sanction for Bennett's misconduct, the board considered four cases cited by the parties in support of their proposed sanction—namely, *Lake Cty. Bar Assn. v. Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180; *Disciplinary Counsel v. Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775; *Disciplinary Counsel v. Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184; and *Disciplinary Counsel v. Quatman*, 108 Ohio St.3d 389, 2006-Ohio-1196, 843 N.E.2d 1205.

{¶ 24} In *Mismas*, the attorney interviewed a third-year law student for a law-clerk position in his office and that evening began sending her inappropriate and sexually explicit text messages. *Mismas* at ¶ 4-5. During this text exchange, he tried to gauge her level of sexual experience, suggested that she perform a sex act for him, and told her that her employment depended on her compliance. *Id*. at ¶ 9-10. Notwithstanding the inappropriate content of these texts, the student accepted employment at Mismas's law firm two days after her interview. *Id.* at ¶ 5. Eleven days after accepting employment, however, she declined an invitation to travel on business with Mismas and he threatened her employment. *Id.* at ¶ 12. When she resigned the next day, Mismas became hostile and threatened to tell her

law professors what a "stupid decision" she had made. *Id*. at ¶ 25. Just two aggravating factors—Mismas's dishonest or selfish motive and the harm to a vulnerable victim—were balanced against four mitigating factors—namely, Mismas's clean disciplinary record, full and free disclosure to the board, good character, and alcohol dependency. *Id*. at ¶ 15-18, 24. We suspended Mismas from the practice of law for one year with six months stayed on the conditions that he engage in no further misconduct and that he continue to comply with the recommendations of his treating medical and psychological professionals. *Id*. at ¶ 26.

{¶ 25} In *Skolnick*, the attorney criticized and verbally harassed his paralegal throughout her two-and-a-half year tenure in his employ. *Skolnick* at ¶ 4-5. He called her "stupid, dumb, fat, 'whorey,' and bitch." *Id.* at ¶ 5. He criticized her appearance and education, made fun of her husband and mother, and proposed that she and another employee perform a sexual act on him so that he could rate their performance. *Id.* at ¶ 4-5. His misconduct was so pervasive that the paralegal met some of the criteria for a diagnosis of posttraumatic stress disorder. *Id*. at ¶ 6. As in *Mismas*, we imposed a one-year suspension with six months conditionally stayed; the only condition was that Skolnick engage in no further misconduct. *Skolnick* at ¶ 15.

{¶ 26} The parties have asserted that the facts of this case are most comparable to *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184. While serving as a municipal-court judge, Berry sent a Facebook friend request to a female court reporter who worked for the same court but was not assigned to Berry's courtroom. *Id*. at ¶ 4. They exchanged several messages on various topics, including their respective divorces, and Berry invited the court reporter to stop by his courtroom to meet in person. *Id.* at ¶ 4-5. A week later, when he accused her of "lurking" and renewed the invitation to visit his courtroom, she responded that she would stop by soon. *Id*. at ¶ 5. After the court reporter declined a lunch

invitation from Berry and failed to respond to another invitation to join him for lunch or drinks, the communications became increasingly one-sided. *Id*. at ¶ 6-9. Berry sent the court reporter a series of images, memes, or links to internet videos— many of which were "overtly partisan and vulgar" and some of which included links to videos containing offensive and sexually suggestive content. *Id*. at ¶ 10-11. Like Bennett, Berry stipulated that his communications were inappropriate and that he had not intended to make his victim uncomfortable. *Id*. at ¶ 2, 12-13. The aggravating and mitigating factors in *Berry* were nearly identical to those present in this case, *see id.* at ¶ 15, except that another sanction has been imposed for Bennett's misconduct by virtue of the loss of his employment.

**{¶ 27}** In *Berry*, the panel recommended that Berry be publicly reprimanded and be required to complete three hours of continuing judicial education on sexual-harassment prevention. *Id*. at ¶ 2, 18. The board, however, recommended that we impose a fully stayed six-month suspension and require Berry to complete eight hours of continuing judicial education on sexual harassment. *Id.* Recognizing that judges are held to higher standards of integrity and ethical conduct than attorneys or others not invested with the public trust and finding that Berry's misconduct had undermined the public's confidence in the impartiality and integrity of the judiciary, we imposed the fully stayed six-month suspension recommended by the board. *Id*. at ¶ 19-21.

**{¶ 28}** In this case, the parties and the board have acknowledged that Bennett's misconduct included an act of unwelcome physical contact that was not present in *Mismas*, *Skolnick*, or *Berry*. However, they observe that in *Quatman*, 108 Ohio St.3d 389, 2006-Ohio-1196, 843 N.E.2d 1205, at ¶ 6, 26, we imposed a fully stayed one-year suspension on an attorney whose misconduct consisted of putting his hands on a client's breasts and stating, "You have very nice breasts."

**{¶ 29}** In addition to the four cases cited by the parties, the board also considered three other cases involving attorneys—one of whom was a judge—who

made unwelcome sexual remarks to students or young lawyers over whom they had supervisory authority. *See Columbus Bar Assn. v. Baker*, 72 Ohio St.3d 21, 647 N.E.2d 152 (1995) (imposing a fully stayed six-month suspension and two years of probation on an attorney who used vulgar and sexually explicit language in the presence of a high-school student who worked in his office); *Cincinnati Bar Assn. v. Young*, 89 Ohio St.3d 306, 731 N.E.2d 631 (2000) (imposing a two-year suspension, with one year conditionally stayed, on an attorney who verbally abused several law students employed in his law office, made sexual comments to them, inappropriately touched at least one of them, and suggested that he could positively or negatively affect their future bar admissions); *Disciplinary Counsel v. Campbell*, 68 Ohio St.3d 7, 623 N.E.2d 24 (1993) (imposing a one-year suspension from the practice of law on a judge who over a period of years made unwelcome or offensive sexual remarks to and/or engaged in offensive physical contact with six women, including four young attorneys over whom he exercised authority as an employer or a judge).

**{¶ 30}** The board also considered two cases involving attorneys who engaged in inappropriate sexual communications with one or more clients, one of whom also engaged in multiple acts of unwanted physical contact with clients and others connected to his work. *See Akron Bar Assn. v. Miller*, 130 Ohio St.3d 1, 2011-Ohio-4412, 955 N.E.2d 359 (imposing a fully stayed six-month suspension and one year of probation on an attorney who, during the course of a single telephone conversation, asked a client about her breast size, stated that she should show him her breasts as a reward, and suggested that she perform a sexual act on him); *Cleveland Metro. Bar Assn. v. Lockshin*, 125 Ohio St.3d 529, 2010-Ohio-2207, 929 N.E.2d 1028 (indefinitely suspending an attorney who made unwelcome and inappropriate sexual comments to multiple clients [including a minor], a potential witness, and a sheriff-department employee and touched several of his victims in a sexually provocative manner).

{¶ 31} While acknowledging that Bennett's misconduct was offensive and unacceptable, the board found that it did not rise to the level of the misconduct in *Mismas*, *Skolnick*, *Young*, *Campbell*, or *Lockshin*, in which the sanctions ranged from a one-year suspension with six months conditionally stayed to an indefinite suspension. The board also found that Bennett's misconduct was more serious than the misconduct in *Berry* in that Berry did not engage in any physical contact with, and had no authority over, his victim. Moreover, the board distinguished this case from *Quatman* on the grounds that Bennett engaged in an ongoing pattern of harassment in addition to a single incident of physical touching and noted that *Miller* contained the additional mitigating factor of a mental disorder and a single instance of improper conduct that is not present in this case. In addition, the board was troubled that Bennett's behavior had been witnessed by at least one other colleague and that there was some evidence indicating that other colleagues had had similar experiences with Bennett.

{¶ 32} The board found that although Bennett did not have the power to hire or fire J.S., his authority was not inconsequential. The board noted that as an experienced attorney in the prestigious position of an AUSA, Bennett had the potential to influence J.S.'s career by introducing her to judges and other lawyers with whom he was well connected and by expressing a favorable opinion of her work product and giving her letters of recommendation. The board recognized that those were "not trivial accolades for a law clerk to acquire from someone of [Bennett's] position" and that, as we have previously recognized, they could potentially " 'set the course for a new attorney's entire legal career,' " *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, at ¶ 22. The board found that Bennett's presence and authority were enough for J.S. to inconvenience herself by asking to work at a different geographical location during her second internship and essentially hide when she needed to work at Bennett's primary office location. Like in *Campbell*, 68 Ohio St.3d at 11, 623 N.E.2d 24, the board concluded that Bennett

"was either directly or indirectly in a position of influence over the complainant" and that "his actions were almost exclusively directed at those most likely to be intimidated by his position"—in this case a law student on the cusp of her legal career.

{¶ 33} After weighing Bennett's misconduct, the aggravating and mitigating factors, and our applicable precedent, the board found that an actual suspension from the practice of law was appropriate. It therefore recommends that we impose a six-month suspension with no stay and that Bennett's reinstatement be conditioned on the submission of proof that he has continued with his current course of mental-health counseling for the duration of his suspension or as otherwise recommended by a qualified healthcare professional.

**BENNETT'S OBJECTIONS TO**
**THE BOARD'S RECOMMENDED SANCTION**

{¶ 34} Bennett raises two objections to the board's recommended sanction. In his first objection, Bennett contends that the board erred in recommending that he be suspended from the practice of law for six months with no stay and argues that a fully stayed six-month suspension with conditions is the appropriate sanction for his misconduct. And in his second objection, Bennett argues that the board erred in considering cases in which attorneys violated Prof.Cond.R. 8.4(h) by engaging in inappropriate conduct *with clients* in determining its recommended sanction. For ease of discussion, we begin our analysis with Bennett's second objection.

**ANALYSIS**

**The board appropriately considered cases of attorney misconduct involving clients in determining the appropriate sanction for Bennett's misconduct directed at a law clerk in an employment setting**

{¶ 35} With respect to Bennett's second objection, we acknowledge that there are inherent differences between attorneys' inappropriate sexual

12

communication and/or conduct involving law clerks, paralegals, and others in the workplace and attorneys' inappropriate sexual communication and/or conduct involving their clients. Of primary importance, the overriding consideration of the trust and confidence between a client and his or her attorney is not present in the workplace relationship. In addition, there is no rule expressly prohibiting the solicitation of a sexual relationship with a colleague in the workplace, as there is in the context of the attorney-client relationship. *See* Prof.Cond.R. 1.8(j) (prohibiting a lawyer from soliciting or engaging in sexual activity with a client unless a consensual sexual relationship existed between them prior to the client-lawyer relationship).

{¶ 36} However, in determining the appropriate sanction for attorney misconduct, " 'we examine each case individually and impose the discipline we believe appropriate based on the unique circumstances of each case.' " *Toledo Bar Assn. v. Hales*, 120 Ohio St.3d 340, 2008-Ohio-6201, 899 N.E.2d 130, ¶ 21, quoting *In re Disciplinary Action Against Ruffenach*, 486 N.W.2d 387, 390 (Minn. 1992); *see also* Gov.Bar R. V(13)(A). To that end, in virtually every attorney-discipline case, we consider previous cases in which we disciplined attorneys for *similar* or *comparable* misconduct that we find to be instructive in determining the appropriate sanction to impose in the case before us. We compare and contrast the facts of the two cases to determine whether the misconduct at issue in the case before us warrants the same sanction, a greater sanction, or a lesser sanction than that imposed in the prior case.

{¶ 37} In keeping with that general practice, we have previously considered cases involving attorneys who engaged in inappropriate sexual communication and/or conduct in determining the appropriate sanction to impose for similar misconduct directed toward a person in the attorney's employ. In fact, we have done so in two cases advanced by the parties and the board to support their respective recommended sanctions in this case. In determining the appropriate

sanction to impose in *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, at ¶ 19, we examined *Disciplinary Counsel v. Detweiler*, 135 Ohio St.3d 447, 2013-Ohio-1747, 989 N.E.2d 41, in which an attorney had sent inappropriate text messages of a sexual nature to, and made sexual advances on, a client.

**{¶ 38}** Similarly, in determining that a one-year suspension, with six months stayed, was the appropriate sanction to impose for Skolnick's longstanding and pervasive pattern of verbally attacking his paralegal, we considered the stayed six-month suspension that we had imposed for inappropriate and unprofessional statements of a sexual nature an attorney made to a client on a single occasion. *See Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, at ¶ 11, citing *Miller*, 130 Ohio St.3d 1, 2011-Ohio-4412, 955 N.E.2d 359.

**{¶ 39}** Furthermore, we note that Bennett joined relator in citing *Quatman*, 108 Ohio St.3d 389, 2006-Ohio-1196, 843 N.E.2d 1205, as an example of an attorney who had received a fully stayed suspension for misconduct involving inappropriate sexual touching—even though the misconduct in that case was directed at a client.

**{¶ 40}** In our view, the inherent differences between sexual misconduct directed toward colleagues versus sexual misconduct directed toward clients should not disqualify a case from being considered in fashioning the appropriate sanction for Bennett's misconduct in this case. On the contrary, our analysis in *Mismas*, *Skolnick*, and countless other disciplinary cases demonstrates that those differences are routinely recognized and considered by the board (and ultimately this court) in determining the weight that any given precedent is afforded in establishing the appropriate sanction for an attorney's misconduct. We therefore overrule Bennett's second objection to the board's recommended sanction.

**A conditionally stayed two-year suspension is the appropriate sanction for**

**Bennett's misconduct in this case**

{¶ 41} In his first objection, Bennett contends that the precedents cited by the board support the imposition of a fully stayed six-month suspension in this case. His primary arguments are that on the spectrum of misconduct identified in those cases, this case falls closer to *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, than to *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, or *Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, in terms of severity as well as the relative imbalance of power between the respondent and the victim.

{¶ 42} While we held the attorney in *Berry* to a higher standard than the average attorney due to his status as a judge, his misconduct is arguably less egregious than Bennett's misconduct in this case. Berry did not know his victim when he first sent her a friend request on social media, though she was a court reporter assigned to the courtroom of another judge of the same court on which Berry was serving. *Berry* at ¶ 4. After the court reporter accepted the friend request, she "liked" some pictures that Berry had posted on social media of the courthouse, and he sent her a private message inquiring about her connection to the courthouse. *Id.* They exchanged several messages, and Berry extended an invitation for the court reporter to stop by his chambers to meet in person. *Id.* When she failed to take him up on the offer, he asked for her cellphone number so that they could talk over the weekend. *Id.* at ¶ 5.

{¶ 43} Although the court reporter felt that she could not refuse Berry's request for her phone number given his status as a judge, *id.*, it does not appear that Berry ever tied that request or his subsequent invitations for lunch or drinks to the court reporter's continued employment. Instead of accepting the court reporter's lack of response as an implicit refusal of his invitations, Berry sent her dozens of social-media messages in which he forwarded images, memes, or links to internet

content that was overtly partisan, vulgar, offensive, or sexually suggestive. *Id*. at ¶ 9-11. However, Berry did not personally create that content or engage in any communication with the court reporter about his own sex life or hers, nor did he make any request for sexual favors or inappropriately touch his victim, as Bennett did in this case. *See id.* at ¶ 4-11.

{¶ 44} Bennett claims to fully appreciate the imbalance of his status and influence as an AUSA in comparison to J.S.'s status as a legal intern, yet he maintains that he was not J.S.'s supervisor and that Judge Berry's status, influence, and power over his victim was similar—if not superior—to his own. Our opinion in *Berry* did not expressly state whether the judge had any authority over the court reporter's employment. While it is evident that Berry had no direct supervisory authority over the court reporter because she did not work in his courtroom, as a judge on the court that employed her, he would have been one of 14 judges who together shared the power to hire or fire her. *See* R.C. 1901.33(A) (providing that the judges of a municipal court may appoint official court reporters); R.C. 1901.08 (authorizing the election of 14 judges to the Hamilton County Municipal Court).

{¶ 45} On the other hand, both Mismas and Skolnick appear to have possessed the unfettered authority to hire, supervise, and fire their victims. Mismas had hired the law student he victimized, and as he sexually harassed her, he told her that her continued employment depended on her compliance with his demands. *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, at ¶ 4-5, 10, 23. She resigned before he had the opportunity to fire her. *Id*. at ¶ 5. Similarly, Skolnick's victim was his own paralegal. *Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, at ¶ 3. And our opinion in *Skolnick* suggests that while the firm employed other attorneys, Skolnick had the power to hire and fire employees. *See id.* at ¶ 10 (after receiving a letter with his victim's accusations, Skolnick "delegated some of his management duties to other attorneys in the firm").

**{¶ 46}** Although Bennett had no authority to hire or fire J.S., he possessed more direct supervisory authority over her than Berry had over his victim but far less than Mismas or Skolnick had over theirs. In her sworn statement to the OIG, J.S. identified another AUSA as her direct supervisor and stated that she did not consider Bennett to be a supervisor. However, she identified Bennett as one in a short list of AUSAs for whom she worked during her USAO internships and further stated that she did her most substantial work for Bennett. She further reported that he would assign tasks to her and would review and evaluate her work. In his objections to the board's report, Bennett acknowledged that he "directed and evaluated J.S.'[s] work on certain tasks." And in his sworn statement to the OIG, he characterized his relationship with J.S. as that of mentor and mentee. Thus, as a practical matter, Bennett possessed more than a modicum of power and authority over J.S.'s work, the contacts she made in the profession, and the possible trajectory of her nascent legal career.

**{¶ 47}** There is no doubt that the *verbal* harassment at issue in *Mismas* and *Skolnick* was more direct, pervasive, and shocking to the conscience than Bennett's inappropriate sexual communications toward J.S. Mismas was far more aggressive than Bennett in steering conversations with his law clerk to sexual topics—and continued to press the matter even after the law clerk told him that his questions were inappropriate. *See Mismas* at ¶ 9-11. Almost two weeks after suggesting that the law clerk perform a specific sex act for him, Mismas pressured her to take an overnight business trip with him and insisted that her continued employment depended on her compliance with his demands. *Id*. at ¶ 5, 10-12, 23. Mismas's harassment occurred over a period of just one month but was so egregious that it resulted in the law clerk's resignation. *Id.* at ¶ 4-5. Although Bennett's misconduct persisted for nearly 18 months through both of J.S.'s internships, J.S. found ways to distance herself from him.

**{¶ 48}** Skolnick's verbal harassment of his paralegal was, likewise, far more direct and degrading than Bennett's harassment of J.S. Skolnick "berated [his paralegal] for her physical appearance, dress, education, and parenting skills." *Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, at ¶ 12. He also called her "a bitch, a 'hoe,' a dirtbag, and a piece of shit, and he told her that he hoped she would die." *Id*. And while driving his paralegal and another female employee to lunch, he proposed that the two women perform a sex act on him as he drove so that he could rate their performances. *Id*. at ¶ 5. Moreover, Skolnick's paralegal was stuck—she could not afford to leave the firm until she had secured another job. *Id*. at ¶ 4. She endured more than two years of Skolnick's abuse and responded to more than 100 employment advertisements before she obtained a new job and was finally able to leave. *Id*. at ¶ 4-6.

**{¶ 49}** Given Bennett's position of authority over J.S., his implicit conditioning of his professional assistance to J.S. on her willingness to provide sexual favors, and his additional acts of misconduct consisting of his request for nude photos, suggestion that he could be J.S.'s sexual partner, and intentional touching of her breasts, we find that Bennett's misconduct most closely aligns with, but is somewhat less egregious than, that of *Mismas*.

**{¶ 50}** "We are ever mindful that the primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship." *Columbus Bar Assn. v. Kiesling*, 125 Ohio St.3d 36, 2010-Ohio-1555, 925 N.E.2d 970, ¶ 44, citing *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368. And in this case, we acknowledge that Bennett has already had a substantial sanction imposed for his misconduct through the loss of his employment as an AUSA. We therefore conclude that it would be inequitable to impose an actual suspension on Bennett equal to the unstayed portion of the sanction that we imposed on Mismas—who had had no other sanctions imposed for

his misconduct. Consequently, we sustain Bennett's first objection to the extent that he challenges the actual six-month suspension recommended by the board.

{¶ 51} In addition to the significant mitigating factors present in this case, we acknowledge that Bennett self-reported to relator after the OIG concluded its investigation. We also credit him for voluntarily seeking mental-health counseling in an effort to understand why he had engaged in the misconduct and to learn how to conduct himself appropriately going forward.

{¶ 52} Nevertheless, we share the board's concern that Bennett may have engaged in similar misconduct with other colleagues—though those acts were not charged in the employment action against him or in this case. Bennett objects to the board's findings in that regard, arguing that the board improperly relied on allegations of uncharged misconduct involving other colleagues that J.S. shared in her sworn statement to the OIG because those allegations were hearsay and he had lacked an opportunity to confront or cross-examine any witnesses regarding them. However, our review of Bennett's sworn statement to the OIG shows that Bennett acknowledged that he may have engaged in similar misconduct by, as he described, "bantering back and * * * forth" and joking in a "similar flirtatious manner" with other colleagues he considered to be friends and that the OIG had confronted him with his own text messages tending to prove that he had engaged in similar misconduct with those colleagues. Although he claimed that none of these other colleagues ever told him that they had been offended and that none had filed a complaint against him, Bennett acknowledged that in retrospect, he may have misread signs that they were not comfortable with his conduct. Furthermore, Bennett expressly acknowledged during his testimony before the hearing panel in this disciplinary case that he might have committed misconduct against other colleagues besides J.S.

{¶ 53} Given the seriousness of the charged misconduct and Bennett's admission that his misconduct may have been more widespread, we conclude that

a conditionally stayed suspension longer than the six-month suspension Bennett has proposed is necessary and appropriate in this case.

{¶ 54} A two-year suspension, stayed in its entirety on the conditions that Bennett engage in no further misconduct and that he continue his current course of mental-health counseling, will best protect the public from additional harm. That sanction will provide a strong incentive for Bennett to comply with his treatment regimen and to conform his conduct to the requirements of the profession while affording us the opportunity to remove him from the practice of law by revoking the stay if he reoffends.

## CONCLUSION

{¶ 55} Accordingly, Mark Stewart Bennett is hereby suspended from the practice of law in Ohio for two years, with the entire suspension stayed on the conditions that he commit no further misconduct, that he continue with his current course of mental-health counseling for the duration of his suspension, and that in the event his treating professional determines that his counseling is complete before he has fully served his suspension, he report to the OLAP and comply with any OLAP recommendations. If Bennett fails to comply with a condition of the stay, the stay will be revoked and he will be required to serve the full two-year suspension. Costs are taxed to Bennett.

Judgment accordingly.

FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

KENNEDY, C.J., concurs in part and dissents in part, with an opinion joined by DETERS, J.

BRUNNER, J., not participating.

_____

**KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 56} Respondent, Mark Stewart Bennett, is a former Assistant United States Attorney. While serving in that position, he sexually harassed a legal intern

for over two years. Addressing that misconduct, the Board of Professional Conduct found two aggravating factors—Bennett had acted with a dishonest or selfish motive, *see* Gov.Bar R. V(13)(B)(2), and he had harmed a vulnerable victim, *see* Gov.Bar R. V(13)(B)(8).

**{¶ 57}** Downplaying the seriousness of Bennett's misconduct, today, this court opts to stay his suspension, thereby allowing him to continue to practice law. While I agree with the majority that Bennett violated Prof.Cond.R. 8.4(h), as found by the board, and that the two aggravating factors are present, I disagree with the majority's determination that a fully stayed suspension is the appropriate sanction in this case.

**{¶ 58}** "Each disciplinary case involves unique facts and circumstances." Gov.Bar R. V(13)(A). Accordingly, this court relies on applicable precedent— cases involving similar misconduct and aggravating and mitigating factors—to ensure a fair and equitable disciplinary system. Our decisions in *Lake Cty. Bar Assn. v. Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, and *Disciplinary Counsel v. Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, support the imposition of an actual suspension here. I would suspend Bennett from the practice of law for one year with six months stayed on the conditions that he (1) engage in no further misconduct, (2) complete six hours of continuing legal education on sexual harassment, and (3) in addition to the requirements of Gov.Bar R. V(24), provide proof that he has continued with his current course of mental-health counseling for the duration of the suspension or as otherwise recommended by a qualified healthcare professional. Therefore, I concur in part and dissent in part.

## I. Background

### A. Misconduct

**{¶ 59}** I agree with the facts set forth in the majority opinion, but some facts require repeating to remind Ohioans of the seriousness of Bennett's conduct. From

2017 to 2019, J.S. interned twice at the United States Attorney's Office for the Northern District of Ohio ("Northern District"). During this period, Bennett was an Assistant United States Attorney for the Northern District. J.S. was a 24-year-old law student when she started her first internship.

{¶ 60} Bennett admits that throughout J.S.'s first internship at the Northern District, he

1. discussed his marital sex life with J.S.,

2. asked J.S. about her sex life,

3. suggested that he could be J.S.'s sexual partner, and

4. touched J.S.'s breasts with the back of his hand.

{¶ 61} Bennett also concedes that J.S.

1. believed that Bennett attempted to look up her skirt or was "looking at [her] butt" on different occasions,

2. heard from a male intern that Bennett had made sexually inappropriate comments about her,

3. said that she had received requests from Bennett to send him nude photos of herself,

4. refused Bennett's Snapchat requests, blocked his phone number, and blocked him on Facebook, and

5. believed that Bennett's touching her breasts was intentional because Bennett made and held eye contact with her during the touching.

{¶ 62} After J.S.'s first internship ended, she sought to return to work at the Northern District, so she asked Bennett whom she should contact about returning. Bennett replied by asking "what she was willing to do to get back into the office," a question that J.S. believed contained sexual overtones. J.S. did not respond to Bennett's reply and ultimately returned for a second internship at the Northern District.

{¶ 63} Upon starting her second internship, J.S. requested to be stationed at the Northern District's Youngstown office rather than where Bennett was stationed (either the Akron office or the Cleveland office). When she was required to work at the Akron office, J.S. disliked interacting with Bennett so much that she would leave the area if she saw him looking for her and would ask a colleague to use the colleague's workstation so that Bennett would not know that she was in the office.

{¶ 64} Bennett admits that during J.S.'s second internship, he

1. texted her about her sex life, including asking whether sex with her then-partner was "really that good,"

2. asked what he would receive in exchange when J.S. requested a letter of recommendation,

3. sent J.S. a Facebook message, asking her, "Why do you haunt my dreams?"

4. in a text-message exchange, texted J.S., "Nice. Can[']t wait to have it" in reference to J.S.'s butt, which he informed her "was looking wide for a while there" when responding to a comment J.S. had made about her appearance, and

5. texted J.S., "Damn [you] for making me think about it again," with "it" referring to sexual activity with her.

{¶ 65} Bennett's conduct led to an investigation by the Office of the Inspector General of the United States Department of Justice. During that investigation, Bennett admitted that he may have asked J.S. for nude photos on Snapchat, a social-media application used for sending and receiving photos. In Bennett's sworn statement to the Office of the Inspector General, he also admitted that he may have engaged in similar misconduct with other colleagues. The Office of the Inspector General completed its investigation, determined that Bennett had violated the Department of Justice's sexual-harassment policy, and recommended that Bennett's employment be terminated. But before the Northern District could terminate his employment, Bennett resigned.

*B. Board's Report*

**{¶ 66}** The board determined that Bennett's conduct violated Prof.Cond.R. 8.4(h), a "catchall" provision that prohibits as professional misconduct a lawyer's engaging "in any other conduct that adversely reflects on the lawyer's fitness to practice law."

**{¶ 67}** The board also found that two aggravating factors and four mitigating factors are present in the case. For aggravating factors, the parties stipulated and the board agreed that Bennett had acted with a dishonest or selfish motive, *see* Gov.Bar R. V(13)(B)(2), and that he had harmed a vulnerable victim, *see* Gov.Bar R. V(13)(B)(8). For mitigating factors, the parties stipulated and the board found (1) the absence of a prior disciplinary record, (2) full and free disclosure to the board or a cooperative attitude toward the proceedings, (3) evidence of good character or reputation, and (4) imposition of other penalties or sanctions. *See* Gov.Bar R. V(13)(C)(1), (4), (5), and (6).

**{¶ 68}** In considering the relevant caselaw, the board found that Bennett's misconduct did not rise to the level of the misconduct found in *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, *Disciplinary Counsel v. Skolnick*, 153 Ohio St.3d 283, 2018-Ohio-2990, 104 N.E.3d 775, *Cincinnati Bar Assn. v. Young*, 89 Ohio St.3d 306, 731 N.E.2d 631 (2000), *Disciplinary Counsel v. Campbell*, 68 Ohio St.3d 7, 623 N.E.2d 24 (1993), or *Cleveland Metro. Bar Assn. v. Lockshin*, 125 Ohio St.3d 529, 2010-Ohio-2207, 929 N.E.2d 1028.

**{¶ 69}** In *Mismas*, we imposed a one-year suspension, with six months conditionally stayed, on an attorney for sending sexually charged text messages to a law-student intern he had hired and for conditioning the student's employment on inappropriate demands. *Mismas* at ¶ 3. In *Skolnick*, we imposed a one-year suspension, with six months conditionally stayed, on an attorney for his longstanding and degrading verbal harassment of his paralegal. *Skolnick* at ¶ 3. In *Young*, we imposed a two-year suspension, with one year conditionally stayed, on

an attorney whose conduct included discriminatory and inappropriate acts and comments toward multiple female law students who were working for that attorney. *Young* at 313, 320-321. In *Campbell*, we imposed a one-year suspension on a judge who had made unwelcome or offensive sexual remarks to, and physical contact with, young lawyers. *Campbell* at 11. Finally, in *Lockshin*, we imposed an indefinite suspension on an attorney who had engaged in a pattern of inappropriate sexual communication and behavior with a number of women, including his clients, and who had failed to file a timely notice of appeal on behalf of a client. *Lockshin* at ¶ 1-2.

{¶ 70} The board here further found Bennett's conduct to be more severe than the conduct in *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, in which we imposed a conditionally stayed six-month suspension on a judge for sending constant inappropriate and vulgar messages. The board also considered *Disciplinary Counsel v. Quatman*, 108 Ohio St.3d 389, 2006-Ohio-1196, 843 N.E.2d 1205, in which we imposed a conditionally stayed one-year suspension on an attorney for putting his hands on a client's breasts and saying, "You have very nice breasts," and *Akron Bar Assn. v. Miller*, 130 Ohio St.3d 1, 2011-Ohio-4412, 955 N.E.2d 359, in which we imposed a conditionally stayed six-month suspension on an attorney who had made inappropriate and unprofessional statements of a sexual nature to a client.

{¶ 71} Here, the board recommends that we impose a six-month suspension and that, as a condition of reinstatement, in addition to the requirements of Gov.Bar R. V(24), Bennett provide proof that he has continued with his current course of mental-health counseling for the duration of his suspension or as otherwise recommended by a qualified healthcare professional.

### C. Bennett's Objections

{¶ 72} Bennett proffers two objections. First, he opposes the board's recommendation of an actual six-month suspension. Instead, he argues that a

stayed six-month suspension is appropriate. Second, he argues that the board erred by relying on Prof.Cond.R. 8.4(h) cases involving relationships and sexual misconduct between attorneys and clients.

## II. Bennett's Objections Should Be Overruled

**{¶ 73}** I concur in the majority's decision to overrule Bennett's second objection related to the consideration of attorney-client caselaw. I further concur in the majority's analysis supporting that decision. But I dissent from the majority's decision to sustain Bennett's first objection in part. I would wholly overrule Bennett's first objection based on his misconduct, the rule violation, the weight of the aggravating factors compared to the mitigating factors, and our relevant caselaw.

## III. Relevant Rule and Aggravating and Mitigating Factors

### A. Conduct that Adversely Reflects on the Lawyer's Fitness to Practice Law

**{¶ 74}** Prof.Cond.R. 8.4(h) prohibits an attorney from engaging in "conduct that adversely reflects on the lawyer's fitness to practice law." To find a violation of Prof.Cond.R. 8.4(h), there must be either "clear and convincing evidence that the lawyer has engaged in misconduct that adversely reflects on the lawyer's fitness to practice law, even though that conduct is not specifically prohibited by the rules," or "proof that the conduct giving rise to a specific rule violation is so egregious as to warrant an additional finding that it adversely reflects on the lawyer's fitness to practice law." *Disciplinary Counsel v. Bricker*, 137 Ohio St.3d 35, 2013-Ohio-3998, 997 N.E.2d 500, ¶ 21.

**{¶ 75}** Here, Bennett stipulated to a violation of Prof.Cond.R. 8.4(h); therefore, Bennett admits there is clear and convincing evidence that he engaged in misconduct that adversely reflects on his fitness to practice law.

### B. Aggravating and Mitigating Factors

**{¶ 76}** As stated above, each disciplinary case involves "unique facts and circumstances," Gov.Bar R. V(13)(A). Therefore, when considering instances of

professional misconduct, the board shall consider aggravating and mitigating factors. *Id.* Aggravating factors weigh in favor of "recommending a more severe sanction." Gov.Bar R. V(13)(B). Mitigating factors weigh in favor of "recommending a less severe sanction." Gov.Bar R. V(13)(C).

{¶ 77} In my view, however, aggravating factors and mitigating factors do not necessarily have equal weight. "The importance or weight of a mitigating or aggravating factor depends on the facts of the case." *Disciplinary Counsel v. Nowicki*, __ Ohio St.3d __, 2023-Ohio-3079, __ N.E.3d __, ¶ 59 (Kennedy, C.J., concurring in part and dissenting in part). Here, the board found two aggravating factors—Bennett had acted with a dishonest or selfish motive, *see* Gov.Bar R. V(13)(B)(2), and he had harmed a vulnerable victim, *see* Gov.Bar R. V(13)(B)(8). The board found four mitigating factors: (1) the absence of a prior disciplinary record, (2) full and free disclosure to the board or a cooperative attitude toward the proceedings, (3) evidence of good character or reputation, and (4) imposition of other penalties or sanctions. *See* Gov.Bar R. V(13)(C)(1), (4), (5), and (6).

{¶ 78} The aggravating factors found here weigh heavily. Bennett exhibited continual selfish conduct over the course of two years. During that time, his actions toward J.S. were self-serving and without consideration of the harm he was causing to J.S., his employer, or the profession. The extent of the vulnerability and resulting harm to J.S. also cannot be overstated. As a female intern and aspiring professional, J.S. was at risk of being taken advantage of, and that is what Bennett did. While in his position of power, Bennett caused J.S. to believe that she needed to go along with Bennett's sexual advances to ensure success in her career. Not only is it possible that Bennett harmed J.S.'s career, but also there is no telling the emotional and psychological harm J.S. may have faced or continues to face.

{¶ 79} Moreover, the mitigating factors do not overcome the aggravating factors. The majority places heavy reliance on the fact that other penalties or

sanctions were imposed on Bennett under Gov.Bar R. V(13)(C)(6)—that is, that his misconduct resulted in the loss of his employment. The majority reasons that "it would be inequitable to impose an actual suspension on Bennett equal to the unstayed portion of the sanction that we imposed on Mismas—who had had no other sanctions imposed for his misconduct." Majority opinion, ¶ 50.

**{¶ 80}** The majority misses the mark here. As explained in more detail below, Mismas was his own boss whereas Bennett worked for the United States government. Mismas could not have received another sanction similar to Bennett's, because Mismas could not fire himself or have the expectation he would be fired as a result of his conduct. But on the other hand, if an attorney who works for the United States government sexually harassed a fellow employee, let alone an intern the attorney has supervisory authority over, that attorney can expect consequences to flow from his actions. Equity is not served by failing to realize this distinction.

### IV. Our Caselaw Warrants an Actual Suspension

#### A. Lake Cty. Bar Assn. v. Mismas *Is on Point*

**{¶ 81}** While the board reviewed, and the majority relies on, a variety of cases, one stands out when making comparisons to the facts here. In *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, at ¶ 4, Mismas sought to hire a law student to work at his law firm. Ms. C., a female law student, interviewed for the position. *Id.* From the date of the interview and for nearly three weeks thereafter, Mismas and Ms. C. exchanged numerous text messages, some of which contained inappropriate advances by Mismas. *Id.* at ¶ 4-5, 9-12.

**{¶ 82}** In the text exchange that began the evening after the job interview, Mismas told Ms. C. that she would "need to take a few beatings" before she could learn to give one, and he then rephrased that statement in sexual terms and asked whether she had engaged in the type of sex act he had referred to. *Id.* at ¶ 9. Ms. C. told him to stop and that their conversation was inappropriate, but he continued and insisted that there needed to be "trust" between them because the job was "not

for the weak." *Id.* As the conversation continued around midnight, Mismas wanted to know how Ms. C. could ensure her loyalty to him. *Id.* at ¶ 10. Mismas proceeded to suggest that Ms. C. perform a sex act for him. *Id.* Ms. C. urged Mismas to admit that he was joking, and Mismas repeatedly refused and insisted that her employment depended on her compliance, telling her, "If you show up at 11 you know what's expected." *Id.* The next day, Mismas asserted that their conversation had been a joke after all. *Id.* at ¶ 11.

{¶ 83} Mismas subsequently invited Ms. C. to two out-of-town events—a deposition and an overnight trip to Washington, D.C. *Id.* at ¶ 12. When she explained she already had plans and would not be joining him on the trip to Washington, Mismas "belittled her for her rejection and pressured her to go by suggesting that her refusal would have adverse consequences for her employment, texting her, 'That's strike 1 for you. 3 strikes and you are out.' " *Id.* Ms. C. resigned the next day. *Id.*

{¶ 84} The board found and this court agreed that Mismas violated Prof.Cond.R. 8.4(h). *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, at ¶ 13. The board also found two aggravating factors—Mismas had acted with a dishonest or selfish motive and had caused harm to Ms. C., a vulnerable victim. *Id.* at ¶ 18. The board found six mitigating factors, but this court ultimately accepted four: (1) the absence of a prior disciplinary record, (2) full and free disclosure to the board and a cooperative attitude toward the proceedings, (3) evidence of good character and reputation, and (4) alcohol dependency. *Id.* at ¶ 15-18, 24.

{¶ 85} Bennett and Mismas violated the same rule, share the same aggravating factors, and share all but one of the same mitigating factors. But the similarities between these tales of two attorneys do not end there. Both Bennett and Mismas sexually harassed a law student who was interning at their place of employment and over whom they had supervisory control. The majority attempts

to justify a fully stayed suspension by distancing Bennett's misconduct from the facts of *Mismas*, but that attempt is not persuasive.

*B. The Majority's Attempt to Distance Bennett's Misconduct from Mismas's Misconduct Is Not Persuasive*

**{¶ 86}** As we explained in *Mismas*, the attorney there engaged "in undignified and unprofessional conduct by targeting an aspirant to the profession for sexual harassment," *Mismas* at ¶ 21. We elaborated:

> Legal clerkships play an important role in developing the practical skills necessary for law students to become competent, ethical, and productive members of the legal profession. Often, the skills, professional relationships, and reputations that students develop in these entry-level positions open the doors to their first full-time legal employment once they graduate and pass the bar exam. These first jobs can set the course for a new attorney's entire legal career. Attorneys who hire law students serve not only as employers but also as teachers, mentors, and role models for the next generation of our esteemed profession. To that end, we expect that attorneys will conduct themselves with a level of dignity and decorum befitting these professional relationships.
>
> Unwelcome sexual advances are unacceptable in the context of any employment, but they are particularly egregious when they are made by attorneys with the power to hire, supervise, and fire the recipient of those advances.

*Id.* at ¶ 22-23.

**{¶ 87}** The majority appropriately notes that Bennett possessed direct supervisory authority over J.S., that he would assign her tasks, that he would review

and evaluate her work, and that they possessed a mentor-mentee relationship, but the majority quarrels with the fact that Bennett's authority over J.S. might be "far less than" Mismas's authority over his victim. Majority opinion at ¶ 46. In *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, we did not distinguish an attorney's power to supervise recipients of sexual advances from their powers to hire or fire them. We should not downplay the power dynamic between aspiring professionals and established attorneys by splitting hairs about the degree of authority an attorney has over an intern.

{¶ 88} Internships are a crucial step in advancing one's career. And "[s]ince students use internships to make contacts and obtain future employment, as well as fulfill degree requirements, and rely on supervisors for experience and recommendations, they are susceptible to sexual bribery or the 'solicitation of sex-linked behavior (e.g., dating) by promise of rewards.' " Maurer & Seibel, *Addressing Problems of Power and Supervision in Field Placements*, 17 Clinical L.Rev. 145, 153 (2010), quoting Bowman & Lipp, *Legal Limbo of the Student Intern: The Responsibility of Colleges and Universities to Protect Student Interns Against Sexual Harassment*, 23 Harv.Women's L.J. 95, 102 (2000).

{¶ 89} In fact, any attorney's sexual advances directed at an intern are enough to cause concern. It is true that "[a]s eager students who want to make a good impression and learn as much as they can, interns may feel uncomfortable rebuffing sexual advances. A student intern may therefore attempt to ignore sexual advances and not complain about inappropriate behavior if she fears that rejecting those advances will hinder her success." Bowman & Lipp at 101-102.

{¶ 90} The majority also attempts to distinguish *Mismas* from the facts of this case on the basis that the conduct in *Mismas* resulted in the intern's resignation. Majority opinion at ¶ 47. The majority additionally gives credence to the fact that "J.S. found ways to distance herself from" Bennett. *Id.* But it is imprudent for the majority to determine the appropriate sanction for attorney misconduct based on

the actions or inactions of the victim. The victim is not the focus of the inquiry in attorney-misconduct cases. The victim has no duty to mitigate or diminish contact with the attorney or to dimmish the opportunities an attorney would have to engage in misconduct. Our focus, and our only focus, is on what the attorney did.

{¶ 91} In fact, Bennett's actions made J.S. uncomfortable, and she stated, "[T]his is what you have to deal with and you don't say anything because then you're going to hurt your chances at a career." Assigning such weight to J.S.'s actions or inactions does not send a good message to aspiring attorneys in this state.

{¶ 92} Additionally, if we are pointing out distinctions between the two cases, we should also recognize that Bennett's conduct spanned two years, compared to approximately three weeks in *Mismas*, and that Bennett touched J.S.'s breast, while Mismas had no physical contact with Ms. C. Therefore, even if, as the majority believes, Bennett's conduct "most closely aligns with, but is somewhat less egregious than, that of *Mismas*," majority opinion at ¶ 49, a one-year suspension with six months stayed would still be appropriate due to the physical contact and the extended period of harassment. By making the leap to a fully stayed suspension, the majority ignores precedent that requires an actual suspension when conduct like Bennett's arises.

C. Disciplinary Counsel v. Berry *Further Supports Imposition of an Actual Suspension*

{¶ 93} In *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, Berry, a judge, sent a Facebook friend request to a court reporter assigned to another courtroom. *Id.* at ¶ 4. After the court reporter accepted the request, Berry messaged the court reporter and eventually invited her to his chambers. *Id.* Around a week later, Berry sent the court reporter a message, saying that she was "lurking" and that she had not stopped by his chambers yet. *Id.* at ¶ 5. Berry at one point asked for the court reporter's cellphone number, which she gave him. *Id.* The parties stipulated that if the court reporter had testified at Berry's disciplinary hearing, she

would have said that she gave Berry her phone number because she felt that she could not refuse. *Id.*

{¶ 94} One Saturday, Berry called the court reporter, and according to her, Berry sounded intoxicated and invited her out for lunch. *Id.* at ¶ 6. She declined Berry's invitation. *Id.* He also asked the court reporter to stop by his office because he intended to offer her and her children tickets to an event, *id.* at ¶ 7, asked her out again but this time for lunch or drinks, *id.* at ¶ 8, and sent her 72 messages on Facebook, with most resulting in a one-sided conversation and many being overly partisan or vulgar, *id.* at ¶ 9-10.

{¶ 95} The board found and we agreed that Berry violated Jud.Cond.R. 1.2 (requiring a judge to act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and to avoid impropriety and the appearance of impropriety). *Berry* at ¶ 13. The board found two aggravating factors—Berry had acted with a selfish motive and he had abused his judicial position when he engaged with the court reporter. *Id.* at ¶ 15. The board found three mitigating factors—Berry had a clean disciplinary record, he had made a timely and good-faith effort to rectify the consequences of his misconduct, and he had made full and free disclosures to the board and had a cooperative attitude toward the disciplinary proceedings. *Id.*

{¶ 96} In analyzing Berry's conduct, we noted that we have held that "judges are held to higher standards of integrity and ethical conduct than attorneys *or other persons not invested with the public trust*." (Emphasis added and cleaned up.) *Id.*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, at ¶ 19. We imposed a conditionally stayed six-month suspension on Berry. *Id.* at ¶ 21.

*D. Bennett's Misconduct Is More Egregious than Berry's Misconduct*

{¶ 97} The majority rightly recognizes that Bennett's misconduct is more egregious than Berry's misconduct, majority opinion at ¶ 42, and that Bennett possessed more direct supervisory authority over J.S. than Berry did over his

victim, *id.* at ¶ 46. After coming to those conclusions, the reasonable next step would be to impose discipline on Bennett that is more impactful than the entirely stayed suspension we imposed on Berry—for example, an actual suspension. But the majority balks in taking that next step and fails to see that even if Bennett's conduct is more egregious than Berry's and less egregious than Mismas's, the particular facts of this case, when viewed beside *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, and *Berry*, support a one-year suspension with six months stayed.

### V. An Actual Suspension Is Necessary to Protect the Public

#### A. Protecting the Public

{¶ 98} The primary purpose of attorney discipline "is not to punish the offender, but to protect the public." *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 53. If the majority were to impose an actual suspension here, this court would fulfill its role of protecting the public "from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship," *Columbus Bar Assn. v. Kiesling*, 125 Ohio St.3d 36, 2010-Ohio-1555, 925 N.E.2d 970, ¶ 44.

{¶ 99} "Protecting the public * * * is not strictly limited to protecting clients from a specific attorney's potential misconduct. Imposing attorney-discipline sanctions also protects the public by demonstrating to the bar and the public that this type of conduct will not be tolerated." *Disciplinary Counsel v. Schuman*, 152 Ohio St.3d 47, 2017-Ohio-8800, 92 N.E.3d 850, ¶ 17. What the majority does today is tell attorneys and the public alike that an attorney in a position of power can continue to sexually harass a law-student intern for over two years, inappropriately touch that intern, and not face any actual time away from practicing law. Any punishment Bennett would face from an actual suspension is merely a byproduct of the protection the suspension would afford vulnerable persons from being harmed.

*B. As a Federal Prosecutor, Bennett Was Subject to a Higher Standard of Conduct*

{¶ 100} When someone gains the privilege to join the legal profession in Ohio, he or she swears an oath, promising to "conduct [himself or herself] with dignity and civility and show respect toward * * * fellow professionals, and all other persons." Gov.Bar R. I(9)(A). There is no question that Bennett violated his oath when he used his position of power to sexually harass an intern at his place of employment. But Bennett's position as a federal prosecutor means he was bound by more than just the baseline attorney oath. In that position, he was a person "invested with the public trust," *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, at ¶ 19.

{¶ 101} As an Assistant United States Attorney, Bennett was required under the Department of Justice's "Justice Manual" to comply with rules on government ethics and applicable rules of professional conduct. U.S. Dept. of Justice, *Justice Manual*, Section 1-4.010 (2018), available at https://www.justice.gov/jm/jm-1-4000-standards-conduct#1-4.010 (accessed Nov. 27, 2023) [https://perma.cc/VHD5-B56W]. The Justice Manual states, "Government ethics rules implement this common value: public service is a *public trust*, meaning that the decisions and actions that federal employees take must be made in the best interests of the American people." (Emphasis added.) *Id.* Complying with these rules "supports the credibility of and faith in government decisions and promotes the common good." *Id.*

{¶ 102} Other state courts have recognized the important position that prosecutors hold, noting, for example, that "[i]t is not too much to say that a lawyer who holds the position of [prosecutor], with the substantial powers of that office, assumes responsibilities beyond those of other lawyers and must be held to the highest standard of conduct." *People v. Brown*, 726 P.2d 638, 641 (Colo.1986). A prosecutor should be held to a higher standard than other attorneys "because of the unique function he or she performs in representing the interests, and in exercising

the sovereign power, of the state." *People v. Hill*, 17 Cal.4th 800, 820, 952 P.2d 673, 72 Cal.Rptr.2d 656 (1998).

{¶ 103} Bennett's actions tainted the public trust. His conduct toward J.S. undermined the credibility of and public faith in government, impeded the common good, and were not in the best interests of the American people, especially J.S. Not only was Bennett in a position of power over J.S. from a supervisory standpoint, but he was also a representative of the United States and possessed all the powers that comes with that position. His actions demeaned both the legal profession and his government office. It is hard to justify a fully stayed suspension if these higher standards were not enough to deter Bennett's misconduct. Rather, an actual suspension is necessary to protect the public.

### C. Possibility of Similar Misconduct

{¶ 104} Further, as recognized by the majority, Bennett acknowledged at both his disciplinary hearing and in his sworn statement to the Office of the Inspector General that he might have committed similar misconduct against other colleagues besides J.S. Majority opinion at ¶ 52. The majority attempts to use this testimony and "the seriousness of the charged misconduct," *id.* at ¶ 53, to justify a longer stayed suspension than Bennett requested—two years compared to six months.

{¶ 105} The majority raises these additional concerns for naught because it ultimately imposes a fully stayed suspension. But these concerns only further support the conclusion that an actual suspension is necessary to protect the public. If, as these statements indicate, Bennett's misconduct is more widespread, an actual suspension would prevent other vulnerable people from being harmed and would therefore protect the public.

### VI. Conclusion

{¶ 106} This court, as the arbiter of the legal profession in this state, has a duty to protect the public from attorney misconduct by outlining the discipline

attorneys will face for their actions. In doing so, we must go forward, not backward, in gauging the appropriate discipline based on the misconduct, caselaw, and surrounding factors. Guided by the contours of *Mismas*, 139 Ohio St.3d 346, 2014-Ohio-2483, 11 N.E.3d 1180, and *Berry*, 166 Ohio St.3d 112, 2021-Ohio-3864, 182 N.E.3d 1184, Bennett's selfish misconduct, and the vulnerability of and resulting harm to J.S., we are led to but one appropriate sanction: a one-year suspension from the practice of law with six-months conditionally stayed. I fear that today's decision by the majority takes us a step in the wrong direction: backward.

{¶ 107} For these reasons, I would suspend Bennett from the practice of law for one year with six months stayed on the conditions that Bennett (1) engage in no further misconduct, (2) complete six hours of continuing legal education on sexual harassment, and (3) in addition to the requirements of Gov.Bar R. V(24), provide proof that he has continued with his current course of mental-health counseling for the duration of his suspension or as otherwise recommended by a qualified healthcare professional.

{¶ 108} Therefore, I concur in part and dissent in part.

DETERS, J., concurs in the foregoing opinion.

—————————

Joseph M. Caligiuri, Disciplinary Counsel, and Matthew A. Kanai, Assistant Disciplinary Counsel, for relator.

Koblentz, Penvose, & Froning, L.L.C., Richard S. Koblentz, Bryan L. Penvose, and Nicholas E. Froning, for respondent.

—————————